RICHARD W. AND JANET ORZECHOWSKI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1973–77.      Filed February 22, 1978.

Richard W. Orzechowski, pro se.
*William F. Halley,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency of $375 in the petitioners' Federal income tax for 1975 and imposed an excise tax of $90. The issues for decision are: (1) Whether a $1,500 contribution to an individual retirement account was deductible under section 219 of the Internal Revenue Code of 1954;[1] and (2) whether any portion of such contribution

---

[1]All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise indicated.

constituted an excess contribution subject to the 6-percent excise tax imposed by section 4973.

## FINDINGS OF FACT[2]

Petitioners Richard W. Orzechowski and Janet Orzechowski, husband and wife, lived in the town of Newburgh, N. Y., at the time they filed their petition in this case. They filed a joint Federal income tax return for 1975. Mr. Orzechowski will sometimes be referred to as the petitioner.

In August 1968, the petitioner went to work for Otis Elevator Co. (Otis) as a forms analyst or systems man in the firm's Corporate Systems and Data Processing Department. In that job, he was in charge of forms control at the corporate level and designed forms for high-speed computers. He was not a computer programmer. He was not a member of a collective bargaining unit, nor was he a temporary, special, or hourly employee. Throughout the period of his employment with Otis, the petitioner was a regular, full-time, salaried employee.

Otis' Basic Retirement Plan for Salaried Employees (the plan) was adopted in 1947, and pursuant to a determination letter issued by the Internal Revenue Service, the plan was determined to be a qualified pension plan under Section 401 during 1975. The plan was noncontributory. All regular, full-time, salaried employees, such as the petitioner, were automatically enrolled in the plan on the first day of the month following their date of employment. However, under the plan, an employee's rights were forfeitable until he had completed 10 years of continuous service. The petitioner was automatically covered by the plan and an active participant therein from virtually the beginning of his employment with Otis.

From November 1974 through November 1975, the petitioner wrote numerous letters to Otis discussing a waiver of participation in the plan. The plan did not permit employees to waive participation. Otis considered, but decided against, adopting such a waiver provision. Otis had consulted actuaries who advised that such voluntary waiver of participation might cause the plan to run the risk of not meeting coverage requirements and to run the risk of losing its qualified status.

---

[2]Special Trial Judge Parker conducted the trial and observed the witnesses, and the findings of fact in this case are based substantially on her factual conclusions.

From his own letters imploring Otis to change the plan to permit a waiver, it is apparent that the petitioner was aware that the plan did not permit waivers, and that his request for a waiver provision had been rejected by Otis. The petitioner even tried to buy out of this noncontributory pension plan, but Otis declined the offer and returned his check. The petitioner had not waived and could not waive participation in the plan.

In November 1975, the petitioner was told informally that he would probably be laid off. Subsequently, on January 15, 1976, his employment with Otis was terminated after 7½ years of continuous service but before he had completed the 10 years necessary to obtain a nonforfeitable interest in the plan. The plan does not give any employee the right to be retained in the service of the company and does not interfere with the company's right to discharge or otherwise deal with an employee. Otis had no policy or practice to deliberately terminate employees before their rights in the plan could vest. The business of the company had declined substantially, and many employees, in addition to the petitioner, were laid off. The petitioner's employment was terminated principally because he was a systems man and not a computer programmer.

In 1975, the petitioner paid $1,500 into an individual retirement account (IRA) and deducted such amount on his 1975 Federal income tax return. In his notice of deficiency, the Commissioner disallowed the deduction and imposed an excise tax of $90.

## OPINION

The first issue for decision is whether the petitioner is entitled to deduct under section 219(a) any portion of his contribution to an IRA.

The Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, was enacted to make retirement plans more effective in providing retirement income for employees. H. Rept. 93–807 (1974), 1974–3 C.B. (Supp.) 236; S. Rept. 93–383 (1973), 1974–3 C.B. (Supp.) 80; see also Conf. Rept. 93–1280 (1974), 1974–3 C.B. 415.[3] The law already provided substantial tax advantages for those employees who were

---

[3]All references to H. Rept. 93–807, S. Rept. 93–383, and Conf. Rept. 93–1280 are to the pages in the Cumulative Bulletin where such reports are published.

covered by their employers' qualified retirement plans. Such employees were not taxable currently on funds contributed to such plans, and the earnings on the funds were also exempt from current taxation. In addition to making many other changes in the law, ERISA undertook to provide comparable tax benefits for those employees whose employers had not established plans for them. It authorizes such employees to create individual retirement accounts; contributions to such accounts are deductible, and the earnings on such accounts are not currently taxed. Conf. Rept. 93–1280 at 497; H. Rept. 93–807 at 361; S. Rept. 93–383 at 209.

The deductibility of contributions to an IRA is governed by section 219. Generally, section 219(a) allows a deduction from gross income for cash contributions to an IRA. Section 219(b)(1) limits the amount of such deduction to the lesser of $1,500 or 15 percent of the individual's compensation includable in his gross income for such taxable year, and section 219(b)(2) disallows any deduction under section 219(a) for the taxable year if, inter alia, the individual claiming the deduction was an active participant in a qualified pension plan under section 401(a) for any part of such taxable year.

During 1975, the petitioner's rights under the Otis plan were forfeitable and because his employment was terminated in 1976, his rights were in fact forfeited. Moreover, he suggests that those engaged in his type of work often serve relatively short periods with the same employer and fail to acquire vested rights under an employer pension plan. For these reasons, he argues that he should not be considered an active participant in the Otis plan for 1975. Yet, it is clear that Congress intended the term "active participant" to include employees such as the petitioner.

Section 219 does not define the term "active participant," but the report of the Ways and Means Committee states:

An individual is to be considered an active participant in a plan if he is accruing benefits under the plan even if he only has forfeitable rights to those benefits. Otherwise, if an individual were able to, *e.g.*, accrue benefits under a qualified plan and also make contributions to an individual retirement account, when he later becomes vested in the accrued benefits he would receive tax-supported retirement benefits for the same year both from the qualified plan and the retirement savings deduction. * * * [H. Rept. 93–807 at 364.]

Although toward the end of 1975 the petitioner learned that his employment with Otis would probably be terminated, and

although his employment was in fact terminated in January 1976, he remained an employee of Otis throughout the year 1975. The Otis plan operated on a fiscal year ending May 31, and for the year ending May 31, 1975, the petitioner was clearly considered an employee for purposes of the plan. Thus, within the terms of the committee report, he was an active participant in a qualified plan at least for a part of 1975 and, therefore, was not entitled to deduct the contribution made in that year to the IRA.

The petitioner contends that he waived participation in the plan in November 1974. However, the record does not support such contention. In his numerous communications with officials of Otis, the petitioner made clear his wish to waive participation in the plan. Yet, he was advised that the plan did not permit him to waive participation in it, and there was no effective waiver on his part.

The petitioner also argues that the plan was not a qualified pension plan. From the fact that he personally was laid off before his rights in the plan vested, he infers that Otis regularly engaged in such practice. He concludes that because of such alleged practice, the plan was discriminatory and therefore not a qualified pension plan under section 401. It is unnecessary to reach the legal argument because the petitioner has not established the factual predicate. The record does not show that Otis had any such policy or practice. The evidence shows that the petitioner's employment was terminated for reasons wholly unrelated to the plan, namely, the decline in Otis' business and the nature of his particular job with Otis.

The second issue for decision is whether the petitioner's contribution to an IRA was an excess contribution subject to the 6-percent excise tax imposed on such contributions by section 4973. Unlike some of the more complicated aspects of ERISA, the provisions dealing with IRA's are relatively straightforward. In a very orderly fashion, the method of creating IRA's, the tax treatment of contributions to, earnings on, and distributions from IRA's, and a series of sanctions to prevent misuse of IRA's—are all clearly set forth. See secs. 408, 219, 4973, 4974; Conf. Rept. 93–1280 at 496–504; H. Rept. 93–807 at 361–377; S. Rept. 93–383 at 208–216.

Section 408(a) describes how an IRA is created. Generally, an individual must organize a United States trust for his or his

beneficiary's exclusive benefit, and the trust instrument must comply with all of the requirements listed in the statute. For example, such instrument must provide that only cash contributions will be accepted, that the trustee will be a bank, that the individual's interest in the account will be nonforfeitable, that trust assets will not be commingled with other assets, that trust funds will not be invested in life insurance contracts, and that the individual's interest in the account will be timely distributed. Once such requirements are met, a valid IRA is created regardless of the subsequent tax treatment of the account. See Conf. Rept. 93-1280 at 497-499; H. Rept. 93-807 at 367-369; S. Rept. 93-383 at 211-213.

As previously discussed, section 219(a) allows a deduction for cash contributions to an IRA subject to certain limitations and restrictions set forth in section 219(b). See Conf. Rept. 93-1280 at 497; H. Rept. 93-807 at 362-364; S. Rept. 93-383 at 210-211. Section 408(e)(1) generally exempts the income of an IRA from Federal income tax without regard to whether contributions to the IRA were deductible, and section 408(d) generally provides that distributions from the IRA are taxable when made. See Conf. Rept. 93-1280 at 501; H. Rept. 93-807 at 370-372; S. Rept. 93-383 at 213-214.

Finally, there are sanctions to prevent the misuse of IRA's. In particular, section 4973 deals with contributions to IRA's in excess of the deduction allowed for such contributions. When the legislation was before the Senate Finance Committee, it was recognized that despite the limit on the deduction allowable for contributions to an IRA, nondeductible contributions might be made to such an account because the earnings on the funds in the account would be exempt from taxation. In the bill approved by that committee, it was provided that if excess contributions were inadvertently made to an IRA, the excess was to be returned after the contributor received notice thereof from the Commissioner. If the excess was not returned, the account was disqualified and the contributor was taxable on the value of the account. On the other hand, if excess contributions were willfully made, the value of the account was taxable to the contributor, and he could not establish another qualified IRA for a period of 5 years. S. 1179, 93d Cong., 1st Sess., sec. 701(b), 119 Cong. Rec. 28467 (1973); S. Rept. 93-383 at 212.

The Senate approach was not included in the legislation as

finally enacted. Under the Senate proposal, the deterrent to making excess contributions may not have been effective. If it could be shown that excess contributions were made willfully, the sanctions were severe, including the disqualification of the account and the inclusion of its value in the income of the contributor. However, if willful conduct could not be established, there was no sanction unless the Commissioner discovered the excess, and then the excess could be returned to the contributor without any penalty. As finally adopted, section 4973 imposes a nondeductible excise tax of 6 percent on any excess contribution, and under section 408(d)(1), the excess contribution is generally taxable when distributed to the contributor.

In this case, the parties assume, and we have no reason to doubt their assumption, that the petitioner met all the requirements of section 408(a) and validly created an IRA in 1975. To it, he made a contribution in 1975, but under section 219, he was entitled to no deduction; thus, the entire contribution was in excess of the amount deductible for the year. The making of such an excess contribution did not cause a disqualification of the account under either section 408 or section 219, but under section 4973, the 6-percent excise tax is clearly applicable to the contribution.

The petitioner argues that in making his contribution to the IRA, he merely wished to seek a judicial determination of whether he had a right to make such a contribution and that he should not be penalized for seeking such a judicial determination. However, the terms of the statute are unequivocal, and an examination of the legislative history leaves no doubt as to the legislative purpose. In deciding how to discourage excess contributions to an IRA, Congress considered at least two alternatives: It considered rules that would have required drawing a distinction between those excess contributions inadvertently made and those willfully made. Upon the making of an excess contribution willfully or upon the failure to refund an excess contribution inadvertently made after notice thereof, the sanction would have been to disqualify the account and tax the fund to the contributor. Yet, Congress ultimately rejected those rules. Instead, it adopted rules under which there is no distinction between excess contributions willfully made or inadvertently made, and there is no disqualification of the account. Under the approach adopted, the 6-percent excise tax is

imposed to offset the benefit that would otherwise flow from the exemption of the income of the fund from taxation, and the more severe sanction is to tax the contributor on the excess contributions when distributed to him. Conf. Rept. 93–1280 at 501–502; H. Rept. 93–807 at 363–366; S. Rept. 93–383 at 211–213.

Some writers have suggested that these sanctions are unduly harsh (see J. Hall, T. Dobson, E. Lipsig, "Individual Retirement Arrangements," 315 Tax Management A–21 (1976), but those suggestions must be evaluated by the Congress. There are substantial tax advantages to be derived by some taxpayers from the establishment of IRA's; as this case demonstrates, there may also be risks for some taxpayers. Congress exercised its legislative judgment in deciding what sanctions were best calculated to achieve its legislative purpose, and no one has suggested that it exceeded its constitutional powers in the decision that it made. Even if we were convinced that a different scheme of sanctions would be fairer or more appropriate, it is not for us to substitute our judgment for that of the Congress. In the absence of a constitutional objection, our responsibility is to carry out the legislative purpose which has been clearly set forth. After carefully examining the legislation and legislative history and judging the petitioner's contention, we conclude and hold that the petitioner's contribution was an excess contribution to which section 4973 is applicable.

*Decision will be entered for the respondent.*

Reviewed by the Court.

DAWSON, *J.*, dissenting in part: While I am in accord with the conclusion reached in the majority opinion on the first issue, I strongly disagree with the imposition of the 6-percent excise tax under section 4973 of the Code. Not only is it unduly harsh and particularly abhorrent to impose the penalty under these circumstances,[1] but it is also unnecessary to treat the petitioner's $1,500 payment as an "excess contribution" to which section 4973 is applicable. In attempting to establish an individual

---

[1] Such a shocking result tempts me to embrace Snoopy's credo: "Curse on all laws but those which love has made." "Peanuts" by Charles M. Schulz (Dec. 2, 1977).

retirement account (IRA), this petitioner acted innocently and in good faith. It seems to me that we can legally free him from the excise tax penalty by stepping out of the shadow of strict construction into the sunlight of reasonable statutory interpretation.

Respondent has imposed an excise tax on the whole amount as "excess contributions" under section 4973. He relied on section 4973(b)(1) which defines "excess contributions" as the excess of the amount contributed for the year (here $1,500) over the amount allowable as a deduction under section 219 (here zero). Respondent and the majority of the Court assume that there was a valid, subsisting IRA to which "excess contributions" could be made. But the facts show that petitioner was not eligible to open an IRA, and the entire $1,500 which he tried to contribute to an IRA will be added back to his 1975 taxable income and taxed. Under the particular facts of this case, I would conclude that no IRA was ever created. Petitioner simply does not come within the statutory scheme which was designed to limit strictly the amount that can be contributed to an IRA each year and to police against and penalize any contributions exceeding that limit.

Section 4973(a) imposes a 6-percent, cumulative, nondeductible excise tax on any excess contributions to an IRA. At the same time, that section provides that the total amount of the tax "shall not exceed 6 percent of the value of the account." Contributions to an IRA are required to be made in cash. Sec. 408(a)(1). The first year an IRA could be set up was 1975. And the only contribution petitioner has ever made was the $1,500 cash paid in 1975, which has been disallowed. It would seem that for petitioner "the value of the account" would be zero; and there is nothing in the other statutory provisions which compels a different result.

The $1,500 ceiling on annual contributions to an IRA is the keystone of the IRA program, which is designed to encourage broad participation by persons of modest incomes. (Conf. Rept. 93–1280, pp. 335–336, 1974–3 C.B. 496–497.) In addition to the $1,500 limitation spelled out in section 219(b)(1), the definition of an IRA in section 408(a)(1) also provides that:

Except in the case of a rollover contribution * * * no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year in excess of $1,500 on behalf of any individual.

To enforce that dollar limitation and to force a taxpayer to eliminate any excess contributions from his IRA, there are numerous penalties and adverse tax consequences.

Assuming that a taxpayer has run afoul of the dollar limitation and has made "excess contributions," there are what have been called the "quadruple adverse tax consequences." J. Hall, T. Dobson, and E. Lipsig, "Individual Retirement Arrangements," 315 Tax Management A–19, A–20. First, the deduction for any excess contribution is disallowed, and the amount of the excess is returned to taxable income and taxed. Sec. 219(b)(1). Petitioner's deduction, however, was not disallowed under section 219(b)(1) for exceeding the maximum contribution, but was disallowed under section 219(b)(2) because he was covered by another tax-free plan.

The second consequence of excess contributions is the 6-percent cumulative, nondeductible excise tax. That tax applies each year until the excess contributions are eliminated from the taxpayer's IRA. Sec. 4973. That penalty tax, of course, is the tax consequence facing petitioner at the moment. The excise tax is designed to force a taxpayer to eliminate the excess contributions from his IRA. Elimination of excess contributions can be accomplished by either distribution or underutilization of allowable contributions in a subsequent year. Sec. 4973(b)(2); Conf. Rept. 93–1280, *supra* at 340–341. Petitioner, being covered by his employer's qualified pension plan, is not eligible for an IRA at all. Therefore, no contribution in any amount is allowable to him, and the underutilization route would be totally foreclosed to him. Only the distribution route would possibly be available to petitioner, and that too would carry adverse tax results.

The third of the quadruple adverse tax consequences is a tax on early distributions. In other words, if excess contributions are eliminated from an IRA by distribution before the taxpayer reaches 59½ years of age or becomes disabled, there is an additional 10 percent tax on the early distribution from his IRA. Sec. 408(f). Lastly, when the excess contribution is eliminated by means of this penalized early distribution, there is a fourth adverse tax consequence. The amount of the distribution is added to gross income and again taxed, because the taxpayer's basis in his IRA is zero. Sec. 408(d)(1).

The basis in an IRA is zero because it is generally contemplat-

ed that contributions to an IRA are made with tax-free dollars and that the contributions and any earnings thereon will not be taxed until distributed to the taxpayer after his retirement. That is not the case with petitioner whose "contribution" will have been made with tax-paid dollars. I recognize, of course, that that is also true for a taxpayer who has made excess contributions to his IRA, and who has properly become subject to the full force of the "quadruple adverse tax consequences" previously mentioned. These cumulative taxes and penalties apply to IRA's and excess contributions thereto. But the whole statutory scheme assumes that there is an IRA in the first place, and that a taxpayer has made excess contributions to it. I believe the statutory scheme should not be stretched beyond its clear intendment. I cannot believe that Congress would expect us to do otherwise. This petitioner innocently tried to open an IRA for which he was not qualified, and I think no valid IRA was created.

The present case is unlike that of an employee who properly creates an IRA in the first instance and where later events affect either the employee's eligibility or the qualification of the IRA itself.[2] For example, if an employee properly creates an IRA and later that year goes to work for a company that has a qualified pension plan, the employee's contribution to his IRA is not deductible and becomes excess contributions. However, there is a statutory grace period during which he can withdraw his contributions without any penalty or adverse tax consequences. Sections 408(d)(4) and 4973(b)(2). Even the 6-percent excise tax is not imposed if the excess contribution is timely withdrawn.[3] This statutory grace period does not apply to a taxpayer, such as petitioner, who believes he is eligible to open an IRA and later finds himself litigating his eligibility.

Petitioner contends that it is unfair for him to have to pay a 6-percent excise tax in order to obtain a Tax Court ruling on his eligibility for an IRA. He complains that the Tax Court's declaratory judgment jurisdiction applies only to employers, who can obtain a determination of the qualification of their

---

[2] An IRA that is validly created may later become disqualified because of prohibited transactions. Sec. 408(e)(2)(A).

[3] This is in part by statute and in part by administrative practice of the Internal Revenue Service. See J. Hall, T. Dobson, and E. Lipsig, "Individual Retirement Arrangements," 315 Tax Management A–20, A–21, and changes and additions thereto for p. A–20.

pension plan (sec. 7476), but that there is no comparable avenue of relief open to an employee who wishes to get a ruling on the qualification of his IRA. He points to the statutory notice of deficiency which states that "No intentional disregard or negligence is implied by the assertion of this excise tax." Obviously this is not a case in which a taxpayer has either deliberately or negligently sought to create an IRA, when he knew or should have known that he was not eligible for one. Petitioner's eligibility was the subject of this particular lawsuit, and the Court has found that he was never eligible to establish an individual retirement account.

I must comment briefly on the majority's statement that the IRA provisions are "relatively straightforward." Maybe the literal import of the provisions are clear to a lawyer, a certified public accountant, or a tax specialist. But to an ordinary, low or middle income taxpayer who is not covered by a qualified pension plan—the very type of person for whom a benevolent Congress created the tax benefit—the provisions are complex and the labyrinth of sanctions and penalties is beset with invisible boomerangs. How can a statute that contains complicated definitions of excess contributions, premature distributions, rollover transfers, and prohibited transactions be characterized as "relatively straightforward"? Unfortunately, the statute can become a horrible trap for an unwary and unsophisticated taxpayer.

I think it is enough to deny this petitioner the deduction he claimed under section 219 by treating the attempted creation of the IRA as a nullity because he was covered at that time by the Otis qualified pension plan. The respondent will recover the deficiency plus interest. The consequences to the petitioner that will flow from holding him liable for the excise tax under section 4973 are horrendous. The excess is subject to a cumulative 6-percent excise tax that is not deductible. If he should withdraw the $1,500, it will be included in his taxable income in the year of withdrawal. Unless he is disabled, any withdrawal or distribution from the IRA is subject to a 10-percent penalty tax if he has not reached age 59½. If for any reason he fails to file an annual IRA return on Form 5329 when it is due, he can be held liable for a penalty of $10 per day (up to a maximum penalty of $5,000) until the return is filed.

Petitioner was at all times disqualified from making a

"contribution" to an IRA. Since section 4973(b) defines "excess contributions" as the excess of the amount contributed over "the amount allowable as a deduction under section 219" and since nothing is allowable as a deduction, I would hold that the $1,500 payment did not constitute an "excess contribution" to an individual retirement account. Therefore, I think the majority has erred in reaching a contrary conclusion on this issue.

FEATHERSTON, DRENNEN, WILES, and WILBUR, *JJ.*, agree with this dissenting opinion.