ROBERT MILLER AND CLARICE MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15026–79.    Filed July 23, 1981.

---

*John H. Cox*, for the petitioners.
*Ronald A. Stein*, for the respondent.

EKMAN, *Judge*: Respondent determined a deficiency of $1,134 in petitioner's Federal income tax for the year 1977. After concessions by petitioners, remaining in issue is whether petitioners are entitled to a deduction under section 219 for a $1,500 contribution made by petitioner-husband to an individual retirement account (IRA) in 1977 and, if petitioners are not entitled to such deduction, whether they are liable for the 6-percent excise tax on excess contributions imposed by section 4973. In an amended answer, respondent asserts that if petitioners prevail and it is determined that they are entitled to the deduction under section 219, petitioners are liable for self-employment tax in the amount of $1,615. Petitioners do not contest the correctness of this adjustment.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Robert Miller (hereinafter petitioner) and Clarice Miller, husband and wife, resided in Elmhurst, Ill., at the time they filed their petition herein. Their Federal income tax return for 1977 was filed with the Internal Revenue Service Center at Kansas City, Mo.

Petitioner's educational background consists of a bachelor's degree with a concentration in sociology and psychology, and a master's degree in social work with a specialization in psychiatric social work with some research techniques. As an undergraduate, petitioner took courses in accounting and economics which, he believed, gave him some understanding of investments in stocks.

Petitioner was employed as a social worker for many years, in university mental hygiene settings, in a Veterans' Administration mental health setting, in hospitals, and in public school systems. He retired from social work in 1971.

Petitioner has also been an active investor since 1951. At the end of 1975, he decided to increase substantially his investment activities because he felt the need, in view of his mother's age and health, to generate additional income. As a result of an inheritance, his savings, and his prior invest-

ments, by 1975 he already controlled, including his mother's assets, between $175,000 and $200,000.

During 1977, petitioner was provided office space at the stock brokerage firm of Dean, Witter & Co., Inc. (Dean-Witter). At Dean-Witter, petitioner had the use of his own desk at no cost and had access to the firm's reference room, research facility, and data retrieval system. He also rented a quotron machine from Dean-Witter at a monthly rental of $65. Petitioner made this arrangement so as to enable him to keep abreast of the stock market. Dean-Witter was willing to enter into the arrangement in view of the substantial commissions it would receive from petitioner, and granted petitioner a commercial discount of 25 percent on all his transactions. Final approval was given by the main office of Dean-Witter in San Francisco, and, at that time, petitioner was told that he was the only Dean-Witter customer to be granted such an arrangement. Dean-Witter also received an additional benefit in that petitioner worked with some of the younger brokers to teach them evaluation techniques. Petitioner has never been a licensed stockbroker and all of the stock transactions engaged in by him during 1977 were through a licensed broker.

Petitioner subscribed to 11 different financial publications at a total cost of $589.39 during 1977. On a typical day, petitioner would begin analyzing investments by reading the Wall Street Journal during the 7:30 a.m. train ride on his way to the Dean-Witter office. Once there, petitioner would continue his research and analysis by, inter alia, monitoring the stock market and specific stocks, reading the Dow Jones ticker tape, reading financial publications, analyzing statistics, and investigating prospective purchases. Petitioner would prepare to leave Dean-Witter at about 3:40 p.m. and would continue his analysis by reading market reports during the train ride home. While at home, petitioner read some of the financial publications to which he subscribed personally as well as publications he borrowed from the library.[1]

Petitioner considered his research and analysis a full-time job and considered himself an active trader, taking advantage of short-term volatility and current developments, rather than

---

[1]Petitioner helped set up the business library at Elmhurst, Ill.

a mere passive investor concerned with long-term gains. During 1977, he paid approximately $30,000 of brokerage fees and commissions (after 25-percent discount) to Dean-Witter and incurred margin interest expense of approximately $5,600.

During 1977, petitioner maintained a cash account, a margin account, and a short account with Dean-Witter. The total number of separate "trades of securities" executed by petitioner during 1977 exceeded 450 and such trades involved, on a gross basis, over $3 million.

On his joint Federal income tax return for 1977, petitioner reported net short-term capital gain of $13,065.06, consisting of short-term capital gains from stock transactions totaling $19,810.65 and short-term capital losses from option transactions totaling $6,745.59. Petitioner also reported net long-term capital gain of $1,504.10, consisting of long-term capital gains from stock transactions of $2,445.19 and long-term capital losses therefrom of $941.09. Such gains or losses resulted from approximately 90 completed stock transactions (75 short-term, 15 long-term), 74 completed option transactions, and 18 completed short sales. In addition, petitioner reported $14,779.88 of dividend income ($14,979.88 less $200 exclusion) and $1,467.20 of interest income.

Petitioner showed no profession for himself on the 1977 return and did not file a Schedule C. Nor did he pay self-employment tax.

On December 10, 1977, petitioner opened an individual retirement account (IRA), under the provisions of section 408, at the Elmhurst National Bank, Elmhurst, Ill. During 1977, petitioner made a $1,500 contribution to that IRA.

OPINION

Section 219(a) provides for a deduction for amounts paid in cash to an IRA described in section 408. Section 219(b)(1) limits the amount deductible to 15 percent of the compensation includable in the individual's gross income for the tax year, or $1,500, whichever is less. Petitioner contends that the profits from his substantial investment activity constitute "compensation" within the meaning of section 219, and that accordingly he is entitled to a deduction of $1,500 for his contribution to an IRA in 1977. Respondent disagrees.

Resolution of this issue involves the interplay of several Code sections. "Compensation" is defined in section 1.219–1(c)(1), Income Tax Regs., as wages, salaries, professional fees, or other amounts derived from personal services actually rendered but does not include amounts derived from or received as earnings or profits from property. Section 219(c)(1) extends the reach of section 219 to self-employed individuals by providing that the term "compensation" includes "earned income" as defined in section 401(c)(2).

"Earned income" under section 401(c)(2) generally means "net earnings from self-employment" (as defined under sec. 1402(a)), but only with respect to a trade or business in which personal services of the taxpayer are a material income-producing factor. Sec. 401(c)(2)(A)(i). "Net earnings from self-employment" under section 1402(a) means the gross income derived by an individual from any trade or business carried on by such individual, less pertinent deductions. "Trade or business" for this purpose has the same meaning as when used in section 162. Sec. 1402(c).

Petitioner contends that because of his substantial activity related to his investments, he was engaged in a trade or business within the meaning of section 162 during 1977, that he was a so-called trader and not a mere investor. See *Levin v. United States*, 220 Ct. Cl. 197, 597 F.2d 760 (1979). Petitioner further contends that the earnings from this trade or business constitute "earned income" and "compensation." Respondent contends that petitioner was not engaged in a trade or business within the meaning of section 162 during that year and that even assuming, arguendo, that he was engaged in a trade or business, his income did not constitute "earned income" and therefore he did not have any "compensation" within the meaning of section 219. We hold that we need not make a factual determination as to whether petitioner's activities rise to the level of a trade or business (see *Higgins v. Commissioner*, 312 U.S. 212 (1941); *Gentile v. Commissioner*, 65 T.C. 1 (1975)), since even if he was in a trade or business, the income generated from his investments did not constitute "earned income" within the meaning of section 401(c)(2) and therefore he did not have any "compensation" within the meaning of section 219.

Section 1402(a)(3)(A) specifically excludes from the term

"net earnings from self-employment" (and thus by extension from the term "earned income") any gain or loss which is considered a gain or loss from the sale of a capital asset.[2] Similarly, section 1402(a)(2) specifically excludes from that term "dividends" and "interest."

Stocks, securities, and the like are capital assets in the hands of an investor or a trader which when sold, exchanged, or otherwise disposed of give rise to capital gain or loss. *Adnee v. Commissioner*, 41 T.C. 40 (1963); *Kemon v. Commissioner*, 16 T.C. 1026 (1951). Thus, petitioner, who reported income only from dividends, interest, and capital gains, had no "earned income" during 1977.

Petitioner relies on *Robida v. Commissioner*, 460 F.2d 1172 (9th Cir. 1972), affg. a Memorandum Opinion of this Court, and *Tobey v. Commissioner*, 60 T.C. 227 (1973), cases involving "earned income" for purposes of section 911. We note that petitioner's invocation of section 911 finds support in the regulations promulgated under section 401. See sec. 1.401–10(c)(1)[3] and (3), Income Tax Regs.; also compare sec. 1.219–1(c)(1), Income Tax Regs., with sec. 911(b).[4] However, the effect of section 911(b) in those regulations is to narrow further the term "earned income"; section 1402(a) "net earnings from self-

---

[2]Also see sec. 1402(a)(3)(C) which specifically excludes from the term "net earnings from self-employment" any gain or loss from the sale, exchange, involuntary conversion, or other disposition of property if such property is neither—

(i) stock in trade or other property of a kind which would properly be includible in inventory if on hand at the close of the taxable year, nor

(ii) property held primarily for sale to customers in the ordinary course of the trade or business.

[3]Sec. 1.401–10(c)(1), Income Tax Regs., provides that:

"For purposes of section 401 and the regulations thereunder, 'earned income' means, in general, net earnings from self-employment (as defined in section 1402(a)) to the extent such net earnings constitute compensation for personal services actually rendered within the meaning of section 911(b)."

[4]Also see predecessors of sec. 401(c)(2)(A) which provided that "the term earned income means net earnings from self-employment (as defined in sec. 1402(a)) to the extent that such net earnings constitute earned income (as defined in sec. 911(b) but determined with the application of subparagraph (B))." Sec. 2(3), Self-Employed Individuals Tax Retirement Act of 1962, Pub. L. 87–792, 76 Stat. 809, 811.

For an explanation of the effect of sec. 911(b) on "earned income" under present law as compared with prior law (prior to sec. 204(c), Foreign Investors Tax Act of 1966, Pub. L. 89–809, 80 Stat. 1539, 1577, effective date rule of sec. 204(d) amended by Pub. L. 90–607, 82 Stat. 1189 (1968)), see 4A J. Mertens, Law of Federal Income Taxation, sec. 25C.05, p. 10–13 (1979).

employment" are considered "earned income" only to the extent that such earnings constitute compensation for personal services rendered within the meaning of section 911(b). In other words, petitioner must initially prove he had section 1402(a) "net earnings from self-employment" and then prove that those net earnings come within the even more limited subcategory created by section 911(b).

In *Robida*, the taxpayer derived income from the manipulation of slot machines. The Court of Appeals held that this income was "earned" and rejected the argument that he could not have "rendered services" to anyone because only he received his services. In *Tobey*, the taxpayer was an artist and we held that his paintings were the products of his labor and skill and the proceeds from their disposition constituted "earned income." Cf. sec. 401(c)(2)(C). Both cases involve the definition of "earned income" when capital is not an income producing factor. Neither case involved the sale of capital assets, and neither case holds that the expenditure of labor will always produce "earned income." When Congress incorporated section 1402(a) into section 401, it specifically excluded dividends, interest, and capital gains from "earned income." Petitioner apparently chooses to ignore this.[5]

Finally, petitioner contends that when Congress used the word "includes" in sections 219(c)(1) and 401(c)(2)(C),[6] it intended a broad interpretation of the statutes rather than a restrictive one. Apparently he is contending either that earned income is but one example of the many types of compensation covered by section 219(c)(1) or that the profits from his investments constitute "compensation" within the meaning of section 219 exclusive of section 219(c)(1). However, section 219(c)(1) was designed to include in the term "compensation" income earned by the self-employed individual, which, except for that provision, would be excluded from the definition of "compensation" under section 219. See H. Rept. 93–779, 1974–

---

[5]See also sec. 1.219–1(c)(1), 1.401–10(c)(3), 1.1402(a)-(5) and -(6), Income Tax Regs.

[6]Sec. 401(c)(2)(C) concerns a taxpayer whose personal efforts created property that generated income. Note the title of sec. 205, Foreign Investors Tax Act of 1966, Pub. L. 89–809, 80 Stat. 1539, 1578: "Treatment of Certain Income of Authors, Inventors, Etc. as Earned Income for Retirement Plan Purposes," and see S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1103.

3 C.B. 244, 369. Thus, if the requirements of section 219(c)(1), which are in actuality the requirements of section 401(c)(2), are not satisfied, self-employment income will not be included in the term compensation.[7] Similarly, section 401(c)(2)(C) was designed to include in the term "earned income" earnings generated by property created by the taxpayer, e.g., the author or the inventor, which otherwise, depending upon the technical form of the transaction through which the income is earned, might have been excluded from that term. See S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1103.

In view of the foregoing, we hold that even if petitioner was in a trade or business, he would not be entitled to a deduction under section 219 for a contribution to an IRA account during 1977 since he had no "compensation" during that year.

Section 4973(a) imposes an excise tax of 6 percent for a contribution to an IRA which is an "excess contribution" within the meaning of section 4973(b). Although petitioner met the requirements of section 408(a) and a valid IRA was created (see *Orzechowski v. Commissioner*, 69 T.C. 750 (1978), affd. 592 F.2d 677 (2d Cir. 1979)), he was not entitled to a deduction under section 219 for the $1,500 contribution to that IRA and that amount is an excess contribution within the meaning of section 4973(b). Accordingly, petitioner is liable for the 6-percent excise tax.

In view of the foregoing,

*Decision will be entered for the respondent.*

---

[7]Also see *Hall v. Commissioner*, T.C. Memo. 1979–342.