108 T.C. No. 5


UNITED STATES TAX COURT


GEORGE AND ELAM CAMPBELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12931-95.            Filed February 18, 1997.


        P was a State employee.  In October 1989, P
elected to transfer from the State Retirement System to
the State Pension System effective November 1989.  As a
consequence, P received a Transfer Refund in 1989
consisting principally of previously taxed
contributions and taxable earnings.  Shortly
thereafter, P deposited approximately one-half of the
taxable portion into an IRA with Loyola.
        P included the entire taxable portion of the
Transfer Refund in income on an amended tax return for
1989.  See <u>Dorsey v. Commissioner</u>, T.C. Memo. 1995-97.
        In April 1991, P closed his Loyola IRA.  On a 1991
tax return, P included in income a portion of the
earnings generated by the IRA but not the balance.  P
contends that sec. 72(e)(6) provides P with a basis in
his IRA equal to the amount rolled over from his
Transfer Refund into the IRA.  R contends that such an
application of sec. 72(e)(6) is contrary to legislative
intent.
        <u>Held</u>, Sec. 72(e)(6) provides P with a basis in his
entire Loyola IRA contribution, the genesis of which

was P's taxed retirement savings; thus, the distribution of such contribution in 1991 is not includable in P's income.  Secs. 72(e)(6), 408(d)(1), I.R.C. 1986.

Thomas F. DeCaro, Jr., for petitioners.

Alan R. Peregoy, for respondent.

OPINION

DAWSON, Judge:  This case was assigned to Special Trial Judge Robert N. Armen, Jr., pursuant to the provisions of section 7443A(b)(4) of the Internal Revenue Code of 1986, as amended, and Rules 180, 181, and 183.[1]  The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  For the taxable year 1991, respondent determined a deficiency in petitioners' Federal income tax, as well as a deficiency in Federal excise tax under section 4980A,[2] in the total amount of $58,464.

---

[1]    Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1991, the taxable year in issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]    Sec. 4980A imposes a 15-percent excise tax on excess distributions from qualified retirement plans.  This tax is included within ch. 43 of the I.R.C. and is subject to the deficiency procedures set forth in subch. B of ch. 63 of the I.R.C.  See sec. 6211(a).

After concessions by the parties,[3] the only issue for decision is whether the distribution received by petitioner George Campbell in 1991 from his individual retirement account with Loyola Federal Savings and Loan is taxable under sections 408(d)(1) and 72.

This case was submitted fully stipulated under Rule 122, and the facts stipulated are so found. Petitioners resided in Prince Frederick, Maryland, at the time that their petition was filed with the Court.

## Background

George Campbell (petitioner) was employed by the Maryland State Highway Administration (the Highway Administration) in 1989 and 1991, and remained so employed at least through the time that this case was submitted for decision. As an employee of the Highway Administration, petitioner was a member of the Maryland State Employees' Retirement System (the Retirement System) until he transferred to the Maryland State Employees' Pension System (the Pension System), effective November 1, 1989.

---

[3] Petitioners concede that $7,762.11 and $9,612.14 of the distributions from petitioner George Campbell's Loyola IRA and Delaware Charter IRA, respectively, represent earnings and are includable in petitioners' gross income for 1991.

Respondent concedes that the amount of unreported income from the IRA distributions is $91,513 (i.e., $172,719 less $81,206), rather than the greater amount determined in the notice of deficiency. Respondent also concedes that petitioners are not liable for the excise tax under sec. 4980A.

See infra p. 9, for further discussion regarding the parties' concessions.

The Retirement System and the Pension System

The Retirement System is a qualified defined benefit plan under section 401(a) and requires mandatory nondeductible employee contributions. The Pension System is also a qualified defined benefit plan under section 401(a), but generally does not require mandatory nondeductible employee contributions. The State of Maryland contributes to both the Retirement System and the Pension System on behalf of the members of those systems. The trusts maintained as part of the Retirement System and the Pension System are both exempt from taxation under section 501(a).[4]

The Transfer Refund

On October 4, 1989, petitioner elected to transfer from the Retirement System to the Pension System, effective November 1, 1989. As a result of his election to transfer, petitioner received a distribution (the Transfer Refund) from the Retirement System in the amount of $174,802.14, which petitioner received in the form of a check dated November 30, 1989.

Petitioner's Transfer Refund consisted of $11,695.84 in previously taxed contributions made by petitioner during his employment tenure with the Highway Administration, $693.52 in

---

[4] For a further discussion of the Retirement System and the Pension System, see Adler v. Commissioner, 86 F.3d 378 (4th Cir. 1996), vacating and remanding T.C. Memo. 1995-148; Maryland State Teachers Association, Inc. v. Hughes, 594 F. Supp. 1353, 1357-1358 (D. Md. 1984).

taxable employer "pick-up contributions",[5] and $162,412.78 of taxable earnings in the form of interest. The earnings and "pick-up contributions", which total $163,106.30, constitute the taxable portion of the Transfer Refund.

If petitioner had not transferred to the Pension System but rather had remained a member of the Retirement System, he would have been entitled to retire at an appropriate age and receive a normal service retirement benefit, including a regular monthly annuity. He would not, however, have been entitled to receive a Transfer Refund because a Transfer Refund is only payable to those who elect to transfer from the Retirement System to the Pension System.

As a result of transferring from the Retirement System to the Pension System, petitioner became, and presently is, a member of the Pension System. As a member of the Pension System, petitioner will be entitled to receive a retirement benefit based upon his salary and his creditable years of service, specifically including those years of creditable service recognized under the Retirement System. However, because petitioner received the Transfer Refund on account of transferring from the Retirement System to the Pension System, petitioner's monthly annuity will be less than the monthly annuity that he would have received if

---

[5]    See sec. 414(h)(2).

he had not transferred to the Pension System but had ultimately retired under the Retirement System.[6]

Rollover of Petitioner's Transfer Refund

Within 60 days of receiving the Transfer Refund, petitioner deposited the taxable portion thereof into two individual retirement accounts (IRA's), as follows:

On December 26, 1989, petitioner deposited $82,900 of the Transfer Refund into an IRA with Loyola Federal Savings and Loan (the Loyola IRA).

On January 2, 1990, petitioner deposited $81,206.39 of the Transfer Refund into an IRA with Delaware Charter Guarantee and Trust Co. (the Delaware Charter IRA).[7]

Distribution of the Loyola IRA

On or about April 11, 1991, Loyola Federal Savings and Loan distributed, and petitioner received, the account balance of

---

[6] It should be recalled that petitioner remained employed by the State of Maryland at the time that this case was submitted to the Court.

[7] Petitioner deposited a total amount of $164,106.39 into his two IRA's. However, the taxable portion of petitioner's Transfer Refund was only $163,106.30. This discrepancy is not explained in the record.

petitioner's IRA; i.e., $90,662.11, which consisted of
petitioner's initial deposit and earnings as follows:

| | |
|---|---|
| IRA deposit: | $ 82,900.00 |
| Earnings: | 7,762.11 |
| Total distribution: | 90,662.11 |

Distribution of the Delaware Charter IRA

In a letter to Delaware Charter Guarantee and Trust Co.,
dated April 8, 1991, petitioner requested that his IRA be
converted into a non-IRA account prior to April 15, 1991.  In
such letter, petitioner stated: "To avoid further IRS penalties I
must have the IRA account closed by April 15, 1991."
Petitioner's IRA was converted into a non-IRA account on June 11,
1991.

The balance of petitioner's Delaware Charter IRA, upon
conversion into a non-IRA account, was $90,818.53, which
consisted of petitioner's initial deposit and earnings as
follows:

| | |
|---|---|
| IRA deposit: | $ 81,206.39 |
| Earnings: | 9,612.14 |
| Account balance on conversion: | 90,818.53 |

Petitioners' 1989 Return

On their Federal income tax return for 1989, petitioners did
not include in gross income any of the taxable portion of the
Transfer Refund; i.e., $163,106.30.  In 1991, petitioners amended
their 1989 income tax return to include the taxable portion of
the Transfer Refund in gross income.  See Dorsey v. Commissioner,

T.C. Memo. 1995-97 (a taxpayer who was employed for 1 year after transferring from the Retirement System to the Pension System was required to include the Transfer Refund in income in the year of receipt); cf. Adler v. Commissioner, 86 F.3d 378 (4th Cir. 1996), vacating and remanding T.C. Memo. 1995-148 (where a member of the Retirement System retired shortly after receiving his Transfer Refund, such member received the Transfer Refund "on account of" retirement and was not required to include such amount in income in the year of receipt).

Petitioners' 1991 Return

On their Federal income tax return for 1991, petitioners disclosed the receipt of distributions from petitioner's IRA's in the total amount of $181,481. Of this amount, petitioners reported $8,762 as the taxable amount.

The Notice of Deficiency

In the notice of deficiency, respondent determined that the difference between the amount distributed from petitioner's IRA's (i.e., $90,662.11 + $90,818.53 = $181,480.64) and the amount reported as taxable ($8,762); i.e., $172,719, was includable in petitioners' gross income for 1991. As a corollary, respondent also determined that petitioners were liable for the 15-percent excise tax imposed by section 4980A.

The Parties' Concessions

    The distribution from petitioner's Delaware Charter IRA is deemed to have occurred before the due date of petitioners' income tax return for the year in which the contribution to that IRA was made.  For that reason, respondent concedes on brief that petitioner's Delaware Charter IRA distribution qualifies for relief pursuant to section 408(d)(4), and that only the portion of such distribution representing earnings; i.e., $9,612.14, is includable in petitioners' gross income.[8]  As a result of this concession, the threshold amount that must be exceeded before the excise tax under section 4980A may be imposed is no longer satisfied; thus, respondent also concedes that petitioners are not liable for such excise tax.[9]

    Petitioners concede that the earnings on petitioner's contributions to petitioner's Delaware Charter IRA and Loyola IRA are includable in petitioners' gross income.

    In view of the foregoing concessions, the only issue remaining for decision is whether $82,900 of the distribution received by petitioner from his Loyola IRA (i.e., $90,662.11 less

----

[8]    For a detailed analysis of sec. 408(d)(4), see Childs v. Commissioner, T.C. Memo. 1996-267; Thompson v. Commissioner, T.C. Memo. 1996-266.

[9]    Insofar as petitioner Elam Campbell might otherwise be concerned, see sec. 4980A(b); Johnson v. Commissioner, 74 T.C. 1057, 1062 (1980), affd. 661 F.2d 53 (5th Cir. 1981).

$7,762.11 that petitioners concede is taxable earnings) is taxable under sections 408(d)(1) and 72.

## Discussion

1.  General Legal Background

Generally, a taxpayer is entitled to deduct the amount contributed to an IRA.  Sec. 219(a); sec. 1.219-1(a), Income Tax Regs.  The deduction in any taxable year, however, may not exceed the lesser of $2,000 or an amount equal to the compensation includable in the taxpayer's gross income for such taxable year.  In addition, the amount of the deduction is limited where the taxpayer was, for any part of the taxable year, an "active participant" in a retirement plan qualified under section 401(a) or a plan established for its employees by the United States, by a State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.  Sec. 219(g)(1), (5)(A)(i), (iii).  In the case of an active participant who files a return as a single individual, the deduction is reduced using a ratio determined by dividing the excess of the taxpayer's modified adjusted gross income (modified AGI) over $25,000, by $10,000.[10]  Sec. 219(g)(2) and (3).  In the case of an active participant who files a joint return, the deduction is reduced

---

[10]    As relevant herein, modified adjusted gross income means adjusted gross income computed without regard to any deduction for an IRA.  Sec. 219(g)(3)(A).

using a ratio determined by dividing the excess of the taxpayer's modified AGI over $40,000 by $10,000.  Id.

Notwithstanding the foregoing limitation, section 408(o) permits individuals to make designated nondeductible IRA contributions to the extent that deductible contributions are not allowable because of the active participant reduction rule set forth in section 219(g).  Sec. 408(o)(1) and (2).  Specifically, an individual may make nondeductible contributions to the extent of the excess of (1) the amount allowable as a deduction under section 219 determined without regard to the reduction for active participants over (2) the amount allowable as a deduction under section 219 determined with regard to such reduction.  Sec. 408(o)(2).

As relevant herein, a contribution to an IRA that exceeds the amount allowable as a deduction under section 219(a), computed without regard to the active participant reduction rule under section 219(g), is considered an excess contribution.  Sec. 4973(b).[11]

In the present case, petitioner made an excess contribution to his Loyola IRA in the amount of $80,900 for 1989 (i.e.,

---

[11]     As relevant herein, an excess contribution may also be viewed as the amount of an IRA contribution that exceeds the sum of (1) the deductible limit under sec. 219(a), computed with regard to sec. 219(g), and (2) the nondeductible limit under sec. 408(o).  S. Rept. 99-313, 545 (1986), 1986-3 C.B. (Vol. 3) 1, 545.

$82,900 less $2,000). The genesis of such contribution was in petitioner's retirement savings which petitioners reported as income on their amended Form 1040 for 1989. This contribution was distributed to petitioner by his IRA on April 11, 1991.

As a general rule, any amount "paid or distributed out of" an IRA is includable in gross income by the taxpayer in the manner provided under section 72. Sec. 408(d)(1). Section 72(e) is applicable, inter alia, to amounts received under an annuity contract but not received as an annuity. The distribution received by petitioner on April 11, 1991, falls into this category.

Amounts received before the annuity starting date are includable in income to the extent allocable to income on the contract and are not includable in income to the extent allocable to the investment in the contract.[12] Sec. 72(e)(2)(B). Thus, section 72(e)(2)(B) effectively gives a taxpayer a basis in the taxpayer's IRA to the extent of his or her investment in the contract. The investment in the contract is defined in section 72(e)(6) as the aggregate amount of consideration paid for the contract reduced by the amount received that was previously

---

[12] Under sec. 72(c)(4), "annuity starting date" is defined as the first day of the first period for which an amount is received as an annuity under the contract. Petitioner received a single payment in the amount of $90,662.11 from his Loyola IRA prior to drawing annuity payments from his retirement account. Thus, the distribution was received by petitioner before the annuity starting date and, accordingly, sec. 72(e)(2)(B) applies.

excludable from gross income.  The amount of a distribution allocable to the investment in the contract, and thus distributed tax-free, is the portion of the amount received that bears the same ratio to the amount received as the investment in the contract bears to the account balance.  Sec. 72(e)(8)(A) and (B).

In determining the taxability of petitioner's IRA distribution from Loyola, it is necessary to determine the amount of the distribution allocable to the "investment in the contract".  In dispute in this case is the meaning of the phrase "aggregate amount of * * * consideration paid for the contract" found in section 72(e)(6), and whether the phrase encompasses the excess contribution made by petitioner in the amount of $80,900. If petitioner's contribution is considered to be an amount paid in consideration for an IRA and, thus, is an "investment in the contract", then section 72 would provide a basis for petitioner's excess contribution and, upon distribution, such amount would be distributed tax-free.  However, if petitioner's excess contribution is not consideration paid for an IRA and, thus, is not an "investment in the contract", then section 72 would not provide a basis in petitioner's excess contribution and, upon distribution, such amount would be taxed in full.

The parties agree that the plain meaning of the language in section 72(e)(6), i.e., "amount of * * * consideration paid for the contract", would include petitioner's excess contribution.

Petitioners essentially urge us to adopt a plain language interpretation of section 72(e)(6) that would give petitioner a basis in his excess contribution.  Respondent contends, however, that a literal interpretation of section 72(e)(6) reaches a result contrary to legislative intent.  Specifically, respondent contends that in amending section 408(d)(1), Congress intended to provide a basis for nondeductible contributions as contemplated by section 408(o), but did not intend to provide a basis for any contributions in excess of the section 408(o) limits.  Thus, respondent urges us to look beyond the words of the statute to interpret its meaning.

In construing section 72(e)(6), our task is to give effect to the intent of Congress, and we must begin with the statutory language, which is the most persuasive evidence of the statutory purpose.  United States v. American Trucking Associations, Inc., 310 U.S. 534, 542-543 (1940).  Ordinarily, the plain meaning of the statutory language is conclusive.  United States v. Ron Pair Enterprises Inc., 489 U.S. 235, 242 (1989).  Where a statute is silent or ambiguous, we may look to legislative history in an effort to ascertain congressional intent.  Burlington N. R.R. v. Oklahoma Tax Commn., 481 U.S. 454, 461 (1987); Griswold v United States, 59 F.3d 1571, 1575-1576 (11th Cir. 1995).  However, where a statute appears to be clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so

as to override the plain meaning of the words used therein.

Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984); see

Pallottini v. Commissioner, 90 T.C. 498, 503 (1988), and cases

there cited.

2.   Section 72(e)(6)

Thus, we turn to the words of section 72(e)(6) that define

investment in the contract, as relevant herein, as "the aggregate

amount of * * * consideration paid for the contract * * * minus

the aggregate amount received under the contract".  In the

instant case, petitioner invested, or paid, $82,900 for his IRA

with Loyola.  Interpreted literally, section 72(e)(6) would treat

such amount as the "investment in the contract" because the

contribution was the consideration paid by petitioner for the

contract.

3.   Legislative History

We find nothing ambiguous in the statute, and, accordingly,

feel controlled by its clear language.  However, respondent

contends that a literal interpretation of section 72(e)(6)

reaches a result contrary to legislative intent.  Thus, we have

examined the legislative histories of the 1974 enactment of

section 408(d)(1), its subsequent amendment in 1986, and the 1986

enactment of section 408(o).  As discussed below, we are not

satisfied that the legislative history relied upon by respondent

rises to the level of unequivocal evidence of legislative purpose

sufficient to override the literal language of the controlling statute.

In the Employee Retirement Income Security Act of 1974, (ERISA) Pub. L. 93-406, 88 Stat. 829, Congress enacted section 408(a), which provided for the creation of individual retirement accounts. In adopting the individual retirement provisions of ERISA, the goal of Congress was to create a system whereby employees not covered by qualified retirement plans would have the opportunity to set aside at least some retirement savings on a tax-sheltered basis. See H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 236, 361; S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 210. Under the statutory framework thus established, individuals could obtain a limited deduction for amounts contributed to individual retirement accounts while earnings on such amounts would accrue tax free. See secs. 219, 408, 409; see also Orzechowski v. Commissioner, 69 T.C. 750, 752-753 (1978), affd. 592 F.2d 677 (2d Cir. 1979); H. Rept. 93-807, supra, 1974-3 C.B. (Supp.) at 361-362; S. Rept. 93-383, supra at 130, 1974-3 C.B. (Supp.) at 209. Individuals who were active participants in employer-sponsored plans were not permitted to make deductible IRA contributions because they were already benefitting as participants in tax-favored plans. See sec. 219(b)(2) as originally enacted by ERISA sec. 2002, 88 Stat. 958.

The individual retirement provisions of ERISA expressly provided that a distribution from an IRA was fully taxable to the distributee upon distribution.  Specifically, section 408(d)(1), as originally enacted by ERISA, provided:

> any amount paid or distributed out of an [IRA] * * * shall be included in gross income by the payee or distributee * * * for the taxable year in which the payment or distribution is received.  <u>The basis of any person in such an account or annuity is zero</u>. [Emphasis added.]

The committee report reveals that Congress intended for taxpayers to have a zero basis in their IRA's because "neither the contributions nor the earnings thereon will have been subject to tax previously."  H. Rept. 93-779 (1974), 1974-3 C.B. 244, 369; see also H. Conf. Rept. 93-1280, at 339 (1974), 1974-3 C.B. 415, 500.

In adopting the IRA provisions of ERISA, Congress recognized that, despite the dollar limitation on deductible contributions to an IRA, a taxpayer might have an incentive to make nondeductible contributions to an IRA because the tax on the earnings would be deferred.  See H. Rept. 93-779, <u>supra</u> at 136, 1974-3 C.B. at 371; H. Conf. Rept. 93-1280, <u>supra</u> at 340, 1974-3 C.B. at 501.  Accordingly, Congress enacted sanctions to prevent excess contributions and the misuse of IRA's.  In particular, Congress imposed a 6-percent excise tax on excess contributions to an IRA in order to offset the benefit that would otherwise result from the deferral of tax on the earnings in the IRA.  See

sec. 4973.  Additionally, Congress continued to fully tax excess contributions upon distribution, despite the fact that such contributions were made with after-tax dollars.  H. Conf. Rept. 93-1280, supra at 340, 1974-3 C.B. at 501; H. Rept. 93-807, supra at 130-131, (1974), 1974-3 C.B. (Supp.) 365-366.  Significantly, the ERISA conference report states, in pertinent part, as follows:

> In general, where contributions in excess of the deductible limits are made to an individual retirement account, no deduction is allowed for the excess amount, and this amount will be subject to a 6 percent tax for the year in which it is made, and each year thereafter, until there is no excess.  The distribution is not to be includible in income if the excess is distributed to the individual on or before the due date for filing the employee's tax return for the year in question (including extensions).  If the distribution occurs after that date, however, the distribution is to constitute taxable income to the employee (because his basis in his account is always zero) and will also give rise to a 10-percent additional tax if the distribution occurs before the employee is 59 ½. [H. Conf. Rept. 93-1280, supra at 340, 1974-3 C.B. at 501; emphasis added.]

As this excerpt illustrates, in enacting section 408(d)(1), Congress consciously and expressly declined to provide a taxpayer with a basis in IRA contributions exceeding the deductible limit. This created the possibility that a taxpayer could be fully taxed on an IRA distribution funded with after-tax contributions.

In the Tax Reform Act (TRA) of 1986, Congress made two significant changes to the IRA provisions.  First, Congress enacted section 408(o), which permits individuals to make "designated nondeductible contributions" to the extent that

deductible contributions are not allowable because of the "active participant" rule.[13]  Although such contributions are not deductible from gross income, they are not subject to the excise tax on excess contributions under section 4973.  Sec. 4973(b), flush language; see sec. 408(o)(2).  Moreover, the earnings on such contributions are permitted to accumulate on a tax-deferred basis and without incurring any excise tax under section 4973. Sec. 408(o); see S. Rept. 99-313, at 543 (1986), 1986-3 C.B. (Vol. 3) 543.  Second, Congress amended section 408(d)(1) to provide an individual with a basis in his or her IRA to the extent of the individual's "investment in the contract".

The conference report to the TRA of 1986 discussed the new approach to taxing IRA distributions as follows:

> if an individual withdraws an amount from an IRA during a taxable year and the individual has previously made both deductible and nondeductible IRA contributions, then the amount [excludable from] income for the taxable year is the portion of the amount withdrawn which bears the same ratio to the amount withdrawn for the taxable year as the individual's aggregate nondeductible IRA contributions bear to the aggregate balance of all IRAs of the individual

---

[13]  In the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 274, Congress eliminated the active participant restriction and extended IRA availability to all taxpayers. However, 5 years later, in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1101(a)(1) 100 Stat. 2085, 2411, Congress enacted sec. 219(g), which reinstated rules imposing restrictions on the availability of IRA deductions to active participants; i.e., individuals covered by an employer-provided retirement plan. Thus, Congress enacted section 408(o) in an effort to provide a tax incentive for discretionary retirement savings for individuals considered active participants in qualified retirement plans.

> \* \* \*. [H. Conf. Rept. 99-841, at II-379 (1986), 1986-3 C.B. (Vol. 4) at 379; emphasis added.]

This excerpt illustrates that Congress intended to provide a basis in "nondeductible contributions". However, nowhere in the legislative history to the TRA of 1986 did Congress address the tax treatment of excess contributions upon distribution.

Respondent asserts that petitioners' interpretation of section 72(e)(6) significantly changes the law and creates a basis in excess contributions where, historically, no basis had been allowed. To the contrary, it was Congress that significantly changed the law by creating basis where none had previously existed. Thus, prior to the TRA of 1986, all IRA distributions, even those the genesis of which was in after-tax contributions, were fully taxed to the taxpayer in the year of distribution because "the basis of any person in [an IRA was] zero." Sec. 408(d)(1) as originally enacted by ERISA. However, in the TRA of 1986 Congress amended section 408(d)(1) by striking the language mandating that taxpayers have a zero basis in their IRA and by substituting therefor an "investment in the contract" approach in taxing IRA distributions. This amendment removes the legislative underpinnings for double taxation upon which respondent heavily relies in this case.

In 1974, when Congress decided to include in income the distribution of excess contributions, it clearly and explicitly required such inclusion in both the language of section 408(d)(1)

and in the legislative history of such section. See sec. 408(d)(1), as originally enacted by ERISA; H. Conf. Rept. 93-1280, supra at 340, 1974-3 C.B. at 501. However, in amending section 408(d)(1) in 1986, Congress omitted any language indicating, either explicitly or implicitly, that excess contributions were to be taxed to the contributor upon distribution from an IRA. Significantly, the legislative history for the TRA of 1986 does not even address the distribution of excess contributions from an IRA.

The statute currently provides for basis to the extent of a taxpayer's "investment in the contract". Absent the requisite expression of intent in sections 408(d)(1) and 72(e)(6), or in the legislative histories of those sections, to tax excess contributions sourced in previously taxed retirement savings, we think that it would be erroneous to deny petitioner a basis in his excess contribution notwithstanding that such contribution would have been without basis prior to the TRA of 1986.

4. Policy

We are satisfied that there is nothing in the legislative history establishing that Congress intended to include in income an IRA distribution, the genesis of which was in retirement savings previously included in income. In fact, to sanction respondent's interpretation of section 72(e)(6) would not further the goal that Congress sought to advance by enacting the

legislation itself. In enacting and amending the IRA provisions in 1974 and 1986, respectively, it is clear that Congress intended to encourage retirement savings and the retention of those savings for retirement use. If denied favorable tax treatment in this situation, petitioners will face retirement without a large portion of petitioner's retirement savings, thus creating the very situation that Congress sought to avoid by enacting the IRA provisions in the first place. See Adler v. Commissioner, 86 F.3d 378, 381 (4th Cir. 1996), vacating and remanding T.C. Memo. 1995-148.

Finally, petitioners contend that respondent's interpretation of section 72(e)(6) should be resisted because otherwise it would lead to petitioner's retirement distribution's being taxed twice. We think petitioners' contention is meritorious. Here we take note of the long-standing principle that double taxation is to be avoided unless expressly intended by Congress. E.g., Maass v. Higgins, 312 U.S. 443, 449 (1941); United States v. Supplee-Biddle Hardware Co., 265 U.S. 189, 195-196 (1924); Tennessee v. Whitworth, 117 U.S. 129, 137 (1886); Verkouteren v. District of Columbia, 433 F.2d 461, 469 (D.C. Cir. 1970). Nothing in section 72(e)(6) suggests that petitioner's retirement distribution should be taxed twice. As previously discussed, such intent is also conspicuously absent in the pertinent legislative history.

5.    <u>Conclusion</u>

In view of the foregoing, we conclude that section 72(e)(6), when considered in conjunction with its legislative history and all of the facts and circumstances peculiar to this case, provides a basis in petitioner's excess contribution.

In order to give effect to our disposition of the disputed issue, as well as the parties' concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.