# United States Tax Court

161 T.C. No. 6

ESTATE OF JAMES E. CAAN, DECEASED, JACAAN
ADMINISTRATIVE TRUST, SCOTT CAAN, TRUSTEE, SPECIAL
ADMINISTRATOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 14783-18.                           Filed October 18, 2023.

————

Decedent (D) held two IRAs with UBS. Both IRAs were governed by a custodial agreement between D and UBS. One of the IRAs held a partnership interest (P&A Interest) in the P&A Fund, a hedge fund. The custodial agreement between D and UBS stated that it was D's responsibility to provide UBS with the P&A Interest's yearend fair market value (FMV) every year. When D did not satisfy this responsibility for tax year 2015, UBS notified D that it had distributed the P&A Interest to him pursuant to the relevant terms of the custodial agreement. P claims such a distribution did not occur.

UBS issued Form 1099–R to D, reporting a distribution. UBS valued the P&A Interest at $1,910,903, which was its 2013 FMV and the last FMV known to UBS. (R admitted in his posttrial briefs that UBS misvalued the P&A Interest.) More than a year after the notification from UBS, D's financial advisor, acting on D's behalf, liquidated the P&A Interest and contributed the cash proceeds to D's IRA at ML, an investment manager.

On his 2015 income tax return, D reported an IRA distribution but claimed that it was nontaxable as a

rollover contribution under I.R.C. § 408(d)(3). R disagreed and issued a notice of deficiency, determining that there was a taxable distribution. D then requested that R issue a private letter ruling to waive the 60-day period for rollover contributions. *See* I.R.C. § 408(d)(3)(A)(i), (I). D also filed a Petition with this Court for redetermination of his 2015 income tax deficiency. *See* I.R.C. § 6213(a). During the pendency of this case, R declined to issue the private letter ruling, stating that the 60-day period could not be waived because D was required to contribute the P&A Interest (not cash) to ML in order for the distribution to be nontaxable as a rollover contribution. *See* I.R.C. § 408(d)(3)(A)(i); *Lemishow v. Commissioner*, 110 T.C. 110, 113 (1998), *supplemented by* 110 T.C. 346 (1998); Treas. Reg. § 1.408-4(b)(1).

*Held*: The P&A Interest was distributed to D in tax year 2015 within the meaning of I.R.C. § 408(d)(1).

*Held, further*, the P&A Interest was not contributed to ML in a manner that would qualify as a rollover contribution under I.R.C. § 408(d)(3).

*Held, further*, under I.R.C. § 408(d)(1), D is taxable for 2015 on the P&A Interest's value at the time of the distribution.

*Held, further*, the value of the P&A Interest at the time of the distribution was $1,548,010.

*Held, further*, we have jurisdiction under I.R.C. § 6213(a) to review R's denial of D's I.R.C. § 408(d)(3)(I) request for a waiver of the 60-day period for rollover contributions.

*Held, further*, we review a denial of a request for a waiver under I.R.C. § 408(d)(3)(I) for abuse of discretion.

*Held, further*, R did not abuse his discretion in denying P a waiver under I.R.C. § 408(d)(3)(I).

_____

3

*Steven Ray Mather*, for petitioner.

*Mark A. Nelson* and *Sarah A. Herson*, for respondent.

COPELAND, *Judge*: James E. Caan was an actor whose successful Hollywood and television career lasted over six decades and proved very lucrative. Throughout his career Mr. Caan focused on his acting roles, leaving to his business managers and financial advisors the tasks of managing his wealth and his day-to-day financial affairs.

This case concerns a portion of the late actor's wealth, namely, two individual retirement accounts (IRAs) that he held at the Union Bank of Switzerland (UBS). One IRA held cash, mutual funds, and stock in exchange-traded funds. The other held similar assets as well as a partnership interest in P&A Multi-Sector Fund, L.P., a hedge fund (P&A Interest and P&A Fund, respectively).

IRAs are not limited to holding traditional assets such as cash, bonds, and publicly traded securities; they can still qualify for tax advantages while holding alternative assets, such as non-publicly traded partnership interests like the P&A Interest. However, in that case the Internal Revenue Service (IRS) requires that the IRA's trustee or custodian report the fair market value of the alternative assets yearly, valued as of December 31 of the preceding year (yearend fair market value). *See* I.R.C. § 408(i);[1] Treas. Reg. § 1.408-5; 2014 Instructions for Forms 1099–R and 5498, at 20, 22 (directing trustees and custodians to report the yearend fair market value of IRA assets "that are not readily tradable on an established US or foreign securities market or option exchange, or that do not have a readily available [fair market value]"). The custodial agreement that governed Mr. Caan's two IRAs at UBS reflected that requirement; it was Mr. Caan's responsibility to provide UBS with the yearend fair market value of the P&A Interest every year. In 2015 Mr. Caan did not provide UBS with the P&A Interest's 2014 yearend fair market value; as a result, UBS refused to continue serving as the P&A Interest's custodian and sent a letter to Mr. Caan notifying him of a distribution of the P&A Interest.

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

UBS then issued Mr. Caan a Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., which reported to the IRS a distribution of the P&A Interest. UBS used the P&A Interest's 2013 yearend fair market value, which was the last yearend fair market value known to UBS, as the value of the distribution.

Also in 2015, but before UBS sent the distribution letter to Mr. Caan, the wealth management advisor who managed both of Mr. Caan's IRAs resigned from UBS and began a similar role at Merrill Lynch, Pierce, Fenner, and Smith, Inc. (Merrill Lynch). That advisor—Michael Margiotta—then convinced Mr. Caan to transfer both IRAs to Merrill Lynch under his management. All assets in both IRAs, except for the P&A Interest, were subsequently transferred to a single IRA at Merrill Lynch through the Automated Customer Account Transfer Service (ACATS).[2] Since the P&A Interest was ineligible for transfer through ACATS, Mr. Margiotta directed the P&A Fund to liquidate the P&A Interest and transfer the cash proceeds to the Merrill Lynch IRA. That liquidation and cash transfer did not occur until almost a year after UBS notified Mr. Caan that it had distributed the P&A Interest.

On his federal income tax return for tax year 2015, Mr. Caan reported a distribution of the P&A Interest but claimed that it was nontaxable. The Commissioner of Internal Revenue (Commissioner) disagreed with that position and, in a notice of deficiency dated April 30, 2018, determined an income tax deficiency of $779,915 for tax year 2015 and a section 6662(a) accuracy-related penalty of $155,983. Mr. Caan then filed a Petition with this Court for redetermination of his 2015 income tax deficiency. *See* I.R.C. § 6213(a). Shortly before filing that Petition, Mr. Caan requested a private letter ruling from the IRS granting him a waiver of the 60-day period for rollovers of IRA distributions (60-day rollover period). *See* I.R.C. § 408(d)(3)(I). The IRS denied that request on the grounds that Mr. Caan did not meet the "same property" requirement in section 408(d)(3)(A)(i) and (D). *See* *Lemishow v. Commissioner*, 110 T.C. 110, 113 (1998) (applying the "same property" requirement of section 408(d)(3) under similar

---

[2] The ACATS is a service run by the National Securities Clearing Corporation. It "automates, expedites, and standardizes procedures for the transfer of many types of securities . . . in a customer account from one brokerage firm and/or bank to another." Office of the Comptroller of the Currency, *Asset Management Operations and Controls* 41 (2011), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/asset-mgmt-ops-controls/pub-ch-asset-mgmt-ops-controls.pdf.

circumstances to deny the taxpayer's claim of a tax-free rollover), *supplemented by* 110 T.C. 346 (1998).

We must decide whether UBS distributed the P&A Interest to Mr. Caan in tax year 2015, and if so, whether that distribution was taxable.

FINDINGS OF FACT

Mr. Caan resided in California both when he filed his Petition (July 30, 2018) and at his date of death (July 6, 2022). His will listed the Jacaan Administrative Trust, dated November 17, 1993 (Trust), as the sole beneficiary of his estate. Scott Caan is the Trust's trustee. As a result, in an Order dated November 7, 2022, we appointed Scott Caan the Special Administrator of Mr. Caan's estate for purposes of this case only. The record does not reflect Scott Caan's state of domicile at the time the Petition was filed nor at Mr. Caan's date of death.

I.    *Background*

A.    *James Caan*

Mr. Caan was an actor who rose to prominence playing Sonny Corleone in *The Godfather*, released in 1972. He had a long and distinguished career in both film and television, with acting roles in over 100 films and television series from 1961 until his death in 2022. Such an active career created substantial demands on his time and caused him to rely on outside professional assistance for many aspects of his personal life.

B.    *Philpott, Bills, Stoll, and Meeks, LLP*

One of the areas of his personal life for which Mr. Caan sought professional assistance was management of his financial affairs. From 1999 until at least the date of trial, Philpott, Bills, Stoll, and Meeks, LLP (PBSM), a firm based in Encino, California, served as his business manager. PBSM's duties included maintaining Mr. Caan's bank accounts, sending and receiving correspondence, paying his bills, preparing his federal and state income tax returns, representing him before the IRS and any relevant state tax agencies, and acting as liaison between Mr. Caan and the various attorneys, financial advisors, insurance agents, and other professionals who assisted him.

As part of its duties, PBSM would receive all of Mr. Caan's mail. A PBSM employee would open the mail and determine its character;

personal mail would be forwarded to Mr. Caan, while mail pertaining to his financial affairs would be forwarded to the PBSM employee in charge of his account. At some point, the financial affairs mail was also scanned into PBSM's document retention system. From 2002 to 2017 Enza Cohn was the PBSM employee in charge of managing Mr. Caan's account. After she left PBSM in 2017, that role passed to David Butler. Ms. Cohn and Mr. Butler are both certified public accountants.

### C.    *Michael Margiotta*

Michael Margiotta is a wealth management advisor who first met Mr. Caan in 2001 while working for Credit Suisse. At the time, Mr. Caan maintained two IRAs at Credit Suisse managed by his cousin, Paul Caan. During 2001 Paul Caan decided to transition from managing investments for wealthy individuals to managing institutional investments, and he transferred management of the IRAs to Mr. Margiotta.

Mr. Margiotta worked at Credit Suisse until 2004. He then worked at Smith Barney & Co. until 2008, UBS until June 2015, and Merrill Lynch up through the date of trial.

## II.    *Individual Retirement Accounts*

### A.    *UBS*

During 2008 UBS became the custodian of the two IRAs owned by Mr. Caan; from 2008 to June 2015 Mr. Margiotta managed those IRAs. One IRA held a portfolio of cash, mutual funds, and exchange-traded funds; the other IRA held a similar portfolio in addition to the P&A Interest.

#### 1.    *Custodianship*

A custodial agreement between UBS and Mr. Caan governed both IRAs. Article IV of the custodial agreement, titled "Investments," states, in pertinent part:

> [T]he Client [Mr. Caan] acknowledges, agrees, understands and warrants the following with respect to any non-publicly traded investment (the "Investment") the Custodian [UBS] allows the Client to hold in the IRA:
>
> . . . .

The Client must furnish to the Custodian in writing the fair market value of each Investment annually by the 15th day of each January, valued as of the preceding December 31st, and within twenty days of any other written request from the Custodian, valued as of the date specified in such request. The Client acknowledges, understands and agrees that a statement that the fair market value is undeterminable, or that cost basis should be used is not acceptable and the Client agrees that the fair market value furnished to the Custodian will be obtained from the issuer of the Investment (which includes the general partner or managing member thereof). The Client acknowledges, understands and agrees that if the issuer is unable or unwilling to provide a fair market value, the Client shall obtain the fair market value from an independent, qualified appraiser and the valuation shall be furnished on the letterhead of the person providing the valuation. The Client acknowledges, understands and agrees that the Custodian shall have no obligation to investigate or determine whether the fair market value so furnished is the correct fair market value (without regard to any actual or constructive knowledge that the Custodian may otherwise have), but if the Custodian otherwise has a different value for such Investment, the Custodian may use such other value in its reports to the Client and to the Internal Revenue Service if the Custodian (in its sole discretion) so chooses. The Client acknowledges, understands and agrees that the Custodian shall rely upon the Client's continuing attention, and timely performance, of this responsibility. The Client acknowledges, understands and agrees that if the Custodian does not receive a fair market value as of the preceding December 31, the Custodian shall distribute the Investment to the Client and issue an IRS Form 1099–R for the last available value of the Investment.

(The P&A Interest was considered a "non-publicly traded investment" under the custodial agreement.) The custodial agreement also provides that it "shall be construed and administered in accordance with the laws of the State of New York, without regard to the choice of law principles thereof."

    2.     *UBS's Requests for the P&A Interest's 2014 Yearend Fair Market Value, Resignation, and Notification of Distribution*

In March 2015 UBS sent a letter addressed to the P&A Fund's operations manager, requesting the P&A Interest's 2014 yearend fair market value. It did not receive a response from the P&A Fund (which claims that it never received the letter).

In August 2015 UBS sent a letter addressed to the "James E Caan Traditional IRA," in care of PBSM, at PBSM's address in Encino, California. The letter stated, in pertinent part:

> As the custodian for your IRA, we [UBS] are required by the U.S. Department of the Treasury to obtain a yearend fair market value (FMV) for each investment held in your UBS IRA. As a condition to UBS holding [the P&A Interest] in your IRA, you agreed to obtain the FMV each year. We attempted to contact the issuer of the investment, but we have not yet received the 2014 FMV for the [P&A Interest].
>
> **Our request**
>
> Please contact the issuer(s) directly and request that they complete the attached form providing the 2014 FMV of the [P&A Interest] . . . **by September 21, 2015.** . . . .
>
> If you are unable to obtain a value from the issuer, you may use a qualified independent appraiser to provide the fair market value. We cannot accept fair market values that are not provided by the issuer or an appraiser.
>
> **Why this is important**
>
> To remain compliant with Treasury regulations, **we will need to resign as IRA custodian of the investment if we do not receive the fair market value of [the P&A Interest]**. The resignation will be recorded as an in-kind distribution; there will be no actual disbursement of funds directly to you. We will send you an IRS Form 1099–R in January 2016 based on the most recent value of the [P&A Interest] in our records.

UBS did not receive a response to that letter from either Mr. Caan or PBSM.

In October 2015 UBS sent a notice addressed to the "James E Caan Traditional IRA," in care of PBSM, at PBSM's address. The notice advised Mr. Caan that UBS had not received a response to its August 2015 letter. The notice warned that as a result, UBS would resign as the P&A Interest's custodian on November 23, 2015. Neither Mr. Caan nor PBSM responded to that notice.

In December 2015 UBS sent a confirmation letter addressed to the "James E Caan Traditional IRA," in care of PBSM, at PBSM's address. That letter stated, in pertinent part:

> As a follow-up to our October 21, 2015 correspondence to you [Mr. Caan], we [UBS] did not receive the 2014 yearend fair market value of [the P&A Interest] . . . . As a result, we have distributed the [the P&A Interest] to you as required by U.S. Treasury regulations.[3]
>
>   . . . .
>
> The distribution has been recorded as an in-kind distribution; there has been no actual disbursement of funds directly to you. We will send you an IRS Form 1099–R in January 2016 based on the most recent value of the [P&A Interest in our records] . . . . When you file your taxes, this distribution may need to be reported as taxable

---

[3] No regulation directly imposes such a requirement. However, if an IRA trustee or custodian cannot provide an updated fair market value of an alternative investment, it is subject to penalties. *See* I.R.C. § 6721(a) (imposing a penalty of $250 for "each failure" to timely file an information return or to accurately include all required information); I.R.C. § 6693(a) (imposing a $50 penalty for "each failure" to comply with certain reporting requirements for IRAs and other tax-favored accounts). Section 408(i) requires IRA trustees and custodians to file reports with the Secretary of the Treasury "with respect to contributions (and the years to which they relate), distributions aggregating $10 or more in any calendar year, *and such other matters as the Secretary may require*." (Emphasis added.) *See also* Treas. Reg. § 1.408-5(b)(5) (requiring IRA trustees and custodians to report to the IRS "[s]uch other information as the Commissioner may require"). The 2014 Instructions for Forms 1099–R and 5498, at 20, directed IRA trustees and custodians to report the 2014 yearend fair market value of "[a]ssets held in an IRA that are not readily tradable on an established US or foreign securities market or option exchange, or that do not have a readily available [fair market value]."

income for 2015; it may also be subject to a 10% early distribution penalty.

Please consult with your tax advisor regarding your personal circumstances. . . . You will now need to contact the issuer of the investment [i.e., the P&A Fund] and instruct them to re-register the [P&A Interest] into your individual name . . . .

. . . .

**You have only 60 days from our November 25 resignation to complete a rollover to a new IRA trustee or custodian, or the distribution may be taxable to you.** As we previously noted, there are non-UBS affiliated or endorsed IRA trust companies that may be willing to hold [the P&A Interest]. Two firms that have indicated to us an interest in holding [assets like the P&A Interest] in IRAs are Millenium Trust Company and PENSCO Trust Company.

UBS thereafter ceased sending account statements for both IRAs; and it did indeed issue a Form 1099–R, reporting to the IRS that it distributed the P&A Interest to Mr. Caan in 2015. It valued the distribution at $1,910,903, which was the P&A Interest's 2013 yearend fair market value.

### B.   *Merrill Lynch*

In June 2015 Mr. Margiotta resigned from UBS and began working for Merrill Lynch. Four months later, in October 2015, he convinced Mr. Caan to transfer the UBS IRAs to Merrill Lynch under his management. After Mr. Caan executed the requisite paperwork, all assets in both IRAs were transferred through ACATS to a single IRA at Merrill Lynch, except for the P&A Interest, which was ineligible for ACATS.

### III.   *Postdistribution Events*

#### A.   *Events Occurring Before the Filing of Mr. Caan's 2015 Income Tax Return*

In March 2016 Ms. Cohn sent the following email message to Tina Fowler, Mr. Margiotta's assistant at Merrill Lynch: "The P&A

investment for James Caan still lists UBS. Shouldn't we change this to [Merrill Lynch]?" Ms. Fowler's response stated, in relevant part:

> I need to reach out to . . . the transfer department to get some info but what I do know (based on the notes I see) is this position was NOT able to be held at Merrill [Lynch] but we were able to update the broker of record to [Michael Margiotta at Merrill Lynch] and the position is not linked to [Mr. Caan's] IRA at UBS any longer.

Seven months later, in October 2016, Ms. Cohn sent an email to Mr. Margiotta, asking: "Have we been able to get everything moved over from UBS on Caan?" Mr. Margiotta responded: "There's nothing at UBS, the P&A fund has UBS listed as the custodian of record of his IRA and when he signs [the necessary documents], we can change that to Merrill [Lynch] as custodian."

### B. *2015 Income Tax Return*

PBSM prepared Mr. Caan's income tax return for tax year 2015, which was timely filed.[4] Line 15a of that return disclosed $2,299,567 in IRA distributions; line 15b reported only $388,664 of that amount as taxable. In other words, a distribution of the P&A Interest was disclosed, but it was reported as nontaxable.[5]

### C. *Events Occurring After the Filing of Mr. Caan's 2015 Income Tax Return*

In December 2016 Mr. Margiotta prepared a request, addressed to the P&A Fund, for a complete liquidation of the P&A Interest and the transfer of the cash proceeds to the Merrill Lynch IRA. After Mr. Caan executed that request, the P&A Fund processed it in three separate wire transfers made on three separate dates: $1,375,000 on January 23, 2017; $80,000 on March 15, 2017; and $77,605.46 on June 21, 2017, for a total of $1,532,605.46.

In November 2017 the IRS sent to PBSM's address a Notice CP2000, Changes to your 2015 Form 1040, addressed to Mr. Caan. The notice proposed to include the distribution of the P&A Interest in gross income as a taxable IRA distribution. PBSM's receipt of that notice

---

[4] This tax return has PBSM's address listed as Mr. Caan's home address.

[5] $2,299,567 − $388,644 = $1,910,923.

caused a flurry of action from Mr. Butler, who at the time was the PBSM employee in charge of Mr. Caan's account. Mr. Butler directed another PBSM employee to send a protest letter, disputing the notice on the ground that UBS issued the Form 1099–R in error. Mr. Butler then sent emails to Mr. Margiotta and UBS representatives requesting that UBS amend its Form 1099–R. After much back and forth, UBS sent Mr. Butler a letter denying his request for it to send an amended Form 1099–R because it was not provided the P&A Interest's 2014 yearend fair market value (despite requesting the value four times), and no evidence was received indicating that the P&A Interest was rolled over to another IRA within 60 days from the distribution date.

IV.     *Petition to the Tax Court and Request for a Private Letter Ruling*

In April 2018 the Commissioner issued Mr. Caan a notice of deficiency for tax year 2015, determining an income tax deficiency of $779,915 on the basis that there had been a taxable distribution of the P&A Interest. The Commissioner also determined that Mr. Caan was liable for a section 6662(a) accuracy-related penalty of $155,983.

On July 27, 2018, Mr. Caan sent a request for a private letter ruling, asking the IRS to waive the requirement that a rollover of an IRA distribution be made within 60 days from the date of the distribution. *See* I.R.C. § 408(d)(3)(A)(i), (I). Three days later, on July 30, 2018, Mr. Caan filed a Petition with this Court for redetermination of his 2015 income tax deficiency. *See* I.R.C. § 6213(a).

In September 2018, during the pendency of this case, the IRS responded to Mr. Caan's request for a private letter ruling, declining to issue such a ruling on the grounds that the P&A Interest was liquidated and cash proceeds were then contributed to the Merrill Lynch IRA. It reasoned that the liquidation and subsequent cash contribution ran afoul of the "same property" requirement of section 408(d)(3)(A)(i) and (D), which meant that a waiver of the 60-day rollover period could not be granted.

OPINION

After concessions,[6] we must decide the following four issues:

1. Whether UBS distributed the P&A Interest to Mr. Caan in tax year 2015.

2. If the P&A Interest was distributed, whether that distribution is nontaxable because it was rolled over into another IRA within the 60-day rollover period.

3. If the P&A Interest was distributed, what its value was at the time of the distribution.

4. If the P&A Interest was distributed, whether we can review the IRS's refusal to issue a private letter ruling waiving the 60-day rollover period under section 408(d)(3)(I); if so, what our standard of review is; and under that standard, whether we should uphold the IRS's refusal to issue Mr. Caan such a private letter ruling.

I. *Burden of Proof*

Generally, we presume that the Commissioner's determinations in a notice of deficiency are correct, and the taxpayer bears the burden of proving those determinations incorrect. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).[7]

The Estate contends that this case involves unreported income and asks us to impose a burden of production on the Commissioner to produce evidence connecting Mr. Caan with the receipt of unreported income (the P&A Interest). It is true that in unreported income cases the Commissioner must either establish a minimal evidentiary showing connecting the taxpayer with the alleged income-producing activity or demonstrate that the taxpayer actually received unreported income.

---

[6] In a Stipulation of Settled Issues dated April 13, 2021, the parties agreed that the Estate of James E. Caan (Estate) is not liable for the section 6662(a) accuracy-related penalty.

[7] Under section 7491(a), the burden of proof shifts to the Commissioner with respect to a factual issue where the taxpayer (1) produced credible evidence regarding that issue; (2) complied with the Code's substantiation and record-keeping requirements; and (3) complied with the IRS's reasonable requests for information. *See also Higbee v. Commissioner*, 116 T.C. 438, 440–41 (2001). The Estate does not contend that section 7491(a) applies, so we do not consider it here.

*Walquist v. Commissioner*, 152 T.C. 61, 67 (2019); *see also Weimerskirch v. Commissioner*, 596 F.2d 358, 362 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977). Only once the Commissioner makes the required threshold showing does the burden shift to the taxpayer, to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. *Walquist*, 152 T.C. at 67–68.

However, this case does not involve unreported income. UBS issued Mr. Caan a Form 1099–R, reporting a distribution of the P&A Interest to the IRS. Mr. Caan likewise reported a distribution of the P&A Interest on his 2015 income tax return, and he claimed that the distribution was nontaxable. This fact defeats the Estate's contention that the deficiency determination involves unreported income. The IRS did not determine that Mr. Caan failed to report a distribution of the P&A Interest; it merely disagreed with his claim that the distribution was nontaxable. Thus, the rule enunciated in *Walquist* does not apply here.

Although this case is not based on unreported income, it is based on an information return. Section 6201(d) provides:

> In any court proceeding, if a taxpayer asserts a reasonable dispute with respect to any item of income reported on an information return filed with the Secretary [of the Treasury] . . . by a third party and the taxpayer has fully cooperated with the Secretary . . . the Secretary shall have the burden of producing reasonable and probative information concerning such deficiency in addition to such information return.

The Estate reasonably challenges the accuracy of UBS's Form 1099–R. However, reasonable evidence in the record supports the Commissioner's determination that a taxable distribution of the P&A Interest occurred (in particular, the series of correspondence from UBS to Mr. Caan). The Commissioner has therefore met his burden of production under section 6201(d). Accordingly, the Estate continues to bear the burden of proving that the Commissioner erred in determining that a taxable distribution occurred.

## II.    *IRAs*

The Estate argues that UBS never distributed the P&A Interest to Mr. Caan. It also argues that, even if UBS did distribute the P&A Interest, Mr. Caan contributed it to his Merrill Lynch IRA in a manner

that would qualify as a nontaxable rollover contribution under section 408(d)(3). We will first discuss the legal background governing IRAs and then decide the merits of these two arguments.

A. *What Is an IRA?*

Section 408 is the main Code provision governing IRAs. It was enacted as part of the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, § 2002(b), 88 Stat. 829, 959, in furtherance of Congress's goal "to create a system whereby employees not covered by qualified retirement plans would have the opportunity to set aside at least some retirement savings on a tax-sheltered basis." *Campbell v. Commissioner*, 108 T.C. 54, 63 (1997); *see also Orzechowski v. Commissioner*, 69 T.C. 750, 754–56 (1978), *aff'd*, 592 F.2d 677 (2d Cir. 1979).

Section 408(a) provides that an IRA is "a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the [requirements enumerated in paragraphs (1) through (6)]." *See also* Treas. Reg. § 1.408-2(b) (explaining those enumerated requirements in further detail). Section 408(h) further provides that for purposes of section 408:

> a custodial account shall be treated as a trust if the assets of such account are held by a bank (as defined in subsection (n)) or [an IRS-approved non-bank entity], and if the custodial account would, except for the fact that it is not a trust, constitute an individual retirement account described in subsection (a). For purposes of [the Code], in the case of a custodial account treated as a trust . . . the custodian of such account shall be treated as the trustee thereof.

*See also* Treas. Reg. § 1.408-2(d). Thus, in enacting section 408, Congress gave taxpayers a choice as to the form of their IRA: a trust IRA or a custodial IRA.

A trust IRA is, at its core, a trust. The taxpayer is the settlor, a bank (or an approved nonbank entity)[8] is the trustee, and an individual

---

[8] Section 408(a)(2) requires the trustee to be a "a bank . . . or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such

(initially the settlor) is the beneficiary. The settlor executes a written trust instrument that meets the section 408(a) requirements and thereby establishes a trust IRA.

A custodial IRA is established by the dual operation of section 408(a) and (h) and is not a trust but a custodial relationship between the taxpayer and an IRS-approved custodian. *See, e.g.*, *Walsh v. Benson*, No. 05-290J, 2006 U.S. Dist. LEXIS 59251, at *8–11 (W.D. Pa. Aug. 18, 2006) (concluding that a qualifying custodial account is merely treated as a trust for purposes of section 408(a)). To form a custodial IRA, the taxpayer executes a written custodial agreement that meets the requirements enumerated in section 408(a)(1) through (6). Once the custodial agreement is executed, section 408(h) treats the custodial agreement as a trust instrument and the custodian as a trustee, which allows for section 408(a) to apply, thereby creating a custodial IRA.

There is a practical difference between trust IRAs and custodial IRAs, as the U.S. District Court for the Western District of Missouri explained:

> The practical difference between "a trust as IRA" and "a custodial account as IRA" involves the duties of the financial institution where the IRA is created. If the IRA is a trust, the institution has a fiduciary responsibility with respect to the investment. If the IRA is a custodial account, the institution's duty is to hold and safeguard the investment; there is no duty with respect to investment decisions. The practical distinction is that a custodial account's investment decisions can be dictated by the IRA owner/beneficiary.

*United States v. Stover*, 731 F. Supp. 2d 887, 901 (W.D. Mo. 2010), *aff'd*, 650 F.3d 1099 (8th Cir. 2011).

Trust IRAs and custodial IRAs have the same three tax attributes, which together constitute the tax-deferral system that

---

other person will administer the trust will be consistent with the requirements of [section 408]." A plain reading of section 408(a)(2) suggests that the phrase "such other person" could mean that an individual that the IRS has approved could be an IRA trustee. However, the regulations make clear that "such other person" means a nonbank entity; in other words, the trustee must be either a bank (as defined in section 408(n)) or an IRS-approved nonbank entity. *See* Treas. Reg. § 1.408-2(b)(2)(i), (e)(2)(i)(A).

Congress created: (1) cash contributions are generally deductible; (2) accretions from the IRA's assets are not taxable (except for section 511 unrelated business income); and (3) distributions are taxable.[9] *See* I.R.C. §§ 219(a) and (b), 408(d)(1), (e)(1); *Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 206 (2009), *aff'd*, 679 F.3d 1109 (9th Cir. 2012); *Campbell*, 108 T.C. at 64; *Orzechowski*, 69 T.C. at 755; Treas. Reg. § 1.219-1(a).

Section 408 merely creates a framework for IRAs. Nothing in section 408 or the regulations thereunder prohibits the parties to a trust or custodial agreement from negotiating the terms of that agreement, so long as the agreement includes the terms required by section 408 and the regulations. Thus, when we decide the merits of a deficiency determination involving an IRA, the text of both section 408 and the agreement itself may be relevant.

B. *Rollover of IRA Distributions and the "Same Property" Rule*

In addition to creating a tax-deferral system through IRAs, Congress provided for nontaxable rollovers of IRA distributions, by which taxpayers can transfer investments from one IRA to another without incurring tax. *See* I.R.C. § 408(d)(3); *Lemishow*, 110 T.C. at 113. When a taxpayer requests an IRA distribution, that distribution is nontaxable if "the entire amount received (including money and any other property) is paid into an [IRA] . . . for the benefit of such individual not later than the 60th day after the day on which he receives the . . . distribution." I.R.C. § 408(d)(3)(A)(i). A taxpayer may also choose to roll over only a portion of the distribution, in which case only the portion that is contributed to another IRA within the 60-day rollover period qualifies as a nontaxable rollover contribution, *see* I.R.C. § 408(d)(3)(D), and the noncontributed portion must be included in income, *see* I.R.C. § 408(d)(1).

If the distribution consists of noncash property, the taxpayer must contribute that exact same property in order for the distribution to be considered a nontaxable rollover contribution under section 408(d)(3)(A)(i). *See Lemishow*, 110 T.C. at 113; Treas. Reg. § 1.408-4(b)(1) (stating that a distribution is nontaxable only if "the entire amount received (including the *same* amount of money and any other property) is paid into an [IRA]" (emphasis added)). In other words, the

---

[9] The first and third attributes are not shared by Roth IRAs. *See* I.R.C. § 408A. The IRAs at issue are not Roth IRAs.

taxpayer cannot change the character of the noncash property. Taxpayers are also limited to one nontaxable rollover of an IRA distribution per one-year period, whether it be a full or partial rollover. I.R.C. § 408(d)(3)(B).[10]

III.   *Issues to Be Decided*

A.      *Was the P&A Interest Distributed?*

During 2008 Mr. Caan opened two custodial accounts with UBS. These accounts were governed by a written custodial agreement between UBS and Mr. Caan. Since the agreement met the requirements of section 408(a), both custodial accounts qualified as IRAs by operation of section 408(a) and (h).

The custodial agreement's Article IV, a portion of which is excerpted *supra* pp. 6–7, sets forth the terms of UBS's custodianship of the P&A Interest. The pertinent terms are the following: (1) It was Mr. Caan's responsibility to provide UBS with the P&A Interest's yearend fair market value by January 15 of each year; (2) it was Mr. Caan's responsibility to attempt to obtain the P&A Interest's yearend fair market value from the P&A Fund directly, and if he could not obtain it from the P&A Fund, to provide UBS with an appraisal from "an independent, qualified appraiser"; and (3) if Mr. Caan did not fulfill his duty of providing UBS with the P&A Interest's yearend fair market value for a given year, then UBS would distribute the P&A Interest to him and issue him a Form 1099–R reflecting "the last available value" of the P&A Interest.

Mr. Caan clearly did not provide UBS with the P&A Interest's 2014 yearend fair market value by January 15, 2015, because in March 2015 UBS sent a letter to the P&A Fund requesting that value. After receiving no response from the P&A Fund, in August 2015 UBS sent Mr. Caan (through PBSM) a letter requesting the P&A Interest's 2014 yearend fair market value and giving him 30 days to respond. Mr. Caan

---

[10] This limitation does not apply to trustee-to-trustee transfers such as transfers through ACATS, because IRA assets are directly transferred from one IRA trustee or custodian to another IRA trustee or custodian. *See* Rev. Rul. 78-406, 1978-2 C.B. 157; *see also Bobrow v. Commissioner*, T.C. Memo. 2014-21, at *13 n.5. Such transfers do not result in a distribution within the meaning of section 408(d)(3)(A) because the IRA assets transferred are not within the direct control or use of the taxpayer. *See* Rev. Rul. 78-406, 1978-2 C.B. 157; *see also Bobrow*, T.C. Memo. 2014-21, at *13 n.5.

did not respond to that letter, leading UBS to send him a notice that the P&A Interest would be distributed and later a confirmation letter that the interest was distributed as of November 25, 2015. The confirmation letter also explained the definite and potential consequences of UBS's resignation as the P&A Interest's custodian, including that UBS would issue Mr. Caan a Form 1099–R reporting a distribution.

These letters show that UBS went above and beyond what the custodial agreement required of it. It had no obligation to contact the P&A Fund to obtain the P&A Interest's 2014 yearend fair market value, yet it did so on Mr. Caan's behalf. It also sent Mr. Caan a request for that value and gave him over 30 days to respond. Although the onus was on Mr. Caan to provide UBS with the P&A Interest's 2014 yearend fair market value, UBS nevertheless tried to help him in fulfilling his duties under the custodial agreement. After receiving no response to its multiple requests, UBS acted well within its rights under the custodial agreement by resigning as the P&A Interest's custodian and distributing the P&A Interest in kind. It even went further by recommending that Mr. Caan contact his tax advisor, reminding him of the 60-day rollover period, and providing him with the names of two firms willing to serve as custodians of the P&A Interest. We therefore determine that UBS distributed the P&A Interest to Mr. Caan on November 25, 2015.

The Estate argues that UBS's distribution of the P&A Interest was a "phantom distribution," alleging that UBS resigned as the P&A Interest's custodian—and purported to "distribute" the interest— without notifying Mr. Caan, PBSM, or Mr. Margiotta. The Estate further alleges that UBS merely generated, without actually mailing, the letters that requested the P&A Interest's 2014 yearend fair market value and only later notified Mr. Caan of a purported distribution. In support of this argument, the Estate relies heavily on the trial testimony of Ms. Cohn and Mr. Margiotta. Both witnesses testified that they had never seen the relevant letters from UBS until this litigation had begun and had not known about UBS's making the distribution.

We do not find that portion of either witness' testimony credible. As the trier of fact, we may credit testimony in full, in part, or not at all. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 84 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). In this instance, the letters were produced in a logical order, each referencing the prior one, and they were all maintained by UBS in its files. The last of the letters, which discussed the in-kind distribution, was followed by the promised Form

1099–R; moreover, all further IRA account statements from UBS ceased. We find it highly unlikely that PBSM received all mail from UBS— statements, the Form 1099–R, and other correspondence—except for the key letters (which were addressed to PBSM). Additionally, the March 2016 email between Ms. Cohn and Mr. Margiotta suggests that both of them knew of UBS's representations that it had distributed the P&A Interest. It seems far more likely that there was simply a lack of communication and coordination between the professionals overseeing Mr. Caan's affairs, especially given the timing of UBS's letters, Mr. Margiotta's move from UBS to Merrill Lynch, and the emails between Mr. Margiotta and Ms. Cohn. If all parties believed that UBS was still the P&A Interest's custodian, why did no one follow up with UBS when it ceased to mail account statements for the IRAs? And why, if everyone was indeed blindsided by the Form 1099–R, did no one promptly follow up with UBS regarding it? (That followup did not occur until after the IRS issued its Form CP2000.) The Estate has offered no satisfactory explanation to fill these holes in its theory.

The Estate further argues that no distribution occurred because Mr. Caan was never placed in actual or constructive receipt of the P&A Interest. We disagree. Under the constructive receipt doctrine "funds [or other property] which are subject to a taxpayer's unfettered command and which he is free to enjoy at his option are constructively received by him whether he sees fit to enjoy them or not." *Estate of Brooks v. Commissioner*, 50 T.C. 585, 592 (1968); *see also Corliss v. Bowers*, 281 U.S. 376, 378 (1930); Treas. Reg. § 1.451-2(a). UBS's December 2015 confirmation letter asked Mr. Caan to contact the P&A Fund and "instruct them to re-register the [P&A Interest] into [his] individual name." We understand that sentence of the letter to mean that, beginning on November 25, 2015, Mr. Caan could have presented that letter to the P&A Fund and instructed it to re-register the P&A Interest in his name without needing any further involvement from UBS.[11] As well, Mr. Caan could have rolled over the P&A Interest into

---

[11] The P&A Interest is a partnership interest, which means that UBS served two roles: (1) it was the P&A Interest's custodian, a role governed by a custodial agreement, and (2) it was a partner in a partnership, a role governed by relevant state law and/or a partnership agreement. The parties stipulated the custodial agreement (which we admitted into evidence), but neither party attempted to introduce a partnership agreement nor any evidence indicating which state's partnership law applied. Normally, we would examine the partnership agreement's text and the relevant state's partnership or property law to decide whether the December 2015 confirmation letter indeed placed Mr. Caan in constructive receipt of the P&A Interest.

an IRA managed by any other custodian or trustee willing to accept it. The presence of these options means that Mr. Caan had unfettered control over the P&A Interest and was therefore in constructive receipt of it.

Lastly, the Estate attempts to discredit UBS's resignation by contending that no resignation or distribution occurred under California trust law. This argument is a nonstarter for two reasons: (1) Mr. Caan's relationship with UBS was a custodial relationship, not a trust relationship, and (2) the custodial agreement states that it is governed by New York law, not California law.

B.     *Was the P&A Interest Contributed in a Manner That Would Qualify as a Rollover Contribution Under Section 408(d)(3)?*

Section 408(d)(3)(A)(i) provides that an IRA distribution is not taxable if "the entire amount received (including money and any other property)" is contributed into another IRA within 60 days of the distribution. The taxpayer may not change the character of any noncash distributed property between the time of the distribution and the time of the contribution. *See Lemishow*, 110 T.C. at 113; Treas. Reg. § 1.408-4(b)(1).

In the previous section, we determined that UBS distributed the P&A Interest to Mr. Caan on November 25, 2015. Sixty days from that date was January 24, 2016. Since the latter date was a Sunday, the 60-day deadline was extended to "the next succeeding day which is not a

---

However, since we do not have the benefit of such sources here, we must decide whether UBS distributed the P&A Interest (and placed Mr. Caan in constructive receipt of it) on the basis of what we do have in the record. The Commissioner, in his notice of deficiency, determined that UBS distributed the P&A Interest. This determination enjoys the presumption of correctness, and the Estate bears the burden of proving this determination erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. at 115. On the one hand, we have the testimonies of Ms. Cohn and Mr. Margiotta that the Estate uses to support its argument that a distribution never occurred. On the other hand, we have a deficiency determination that a distribution did occur, which is entitled to the presumption of correctness. That determination is further supported by the text of the custodial agreement and the UBS letters to Mr. Caan excerpted *supra* pp. 6–10. Our finding that Ms. Cohn and Mr. Margiotta did not credibly testify that they had never seen the letters before and did not know about the distribution eliminates the sole evidence in support of the Estate's argument, shifting the weight of the evidence in favor of the Commissioner. We therefore conclude that the December 2015 confirmation letter served as the document which conveyed the partnership interest from UBS to Mr. Caan.

Saturday, Sunday, or a legal holiday." I.R.C. § 7503. Thus, Mr. Caan had until January 25, 2016, to contribute the P&A Interest to another IRA.

We acknowledge that Mr. Caan executed a request in October 2015 to transfer all assets in his two UBS IRAs to Merrill Lynch and that all assets other than the P&A Interest were transferred through ACATS shortly thereafter. Troublesome here is how the P&A Interest was handled. Mr. Margiotta (acting on Mr. Caan's behalf) submitted a withdrawal request to the P&A Fund in December 2016, asking it to fully liquidate the P&A Interest and remit the proceeds directly to the Merrill Lynch IRA. This action occurred over a year after the UBS distribution. The P&A Fund then remitted a total of $1,532,605.46 in three separate wire transfers between January 23 and June 21, 2017.

There are three problems with the way the P&A Interest was handled. First, and most importantly, in liquidating the P&A Interest Mr. Caan changed the character of the property; yet section 408(d)(3)(A)(i) required him to contribute the P&A Interest itself, not cash, to another IRA in order to preserve its tax-deferred status. *See Lemishow*, 110 T.C. at 113; Treas. Reg. § 1.408-4(b)(1). Second, the contribution of the cash proceeds from the liquidation occurred long after the January 25, 2016, deadline. And finally, the P&A Fund's three transfers to the Merrill Lynch IRA constituted three separate contributions; yet section 408(d)(3)(B) allows for only one rollover contribution in any one-year period, making only the first transfer potentially eligible for a tax-free rollover.

As discussed *supra* pp. 17–18, our caselaw and the regulations have interpreted section 408(d)(3)(A)(i) to require the *same* money or the *same* property to be transferred in a rollover, rather than merely similar property or property of equivalent value. *See Lemishow*, 110 T.C. at 113; Treas. Reg. § 1.408-4(b)(1). In *Lemishow*, we discussed the legislative history supporting this interpretation:[12]

---

[12] In *Lemishow*, 100 T.C. at 111, the taxpayer had maintained Keogh plans (which generally allow larger annual contributions than do IRAs but must be funded only with income earned through self-employment, *see* I.R.C. §§ 402(c), 415) and IRAs with two different banks. He requested cash distributions from both account types, which he then used to purchase stock. *Lemishow*, 110 T.C. at 111. He then opened an IRA with Smith Barney Shearson and contributed the stock to that IRA. *Id.* at 111–12. Distributions from Keogh plans are governed by section 402, while distributions

Both rollover provisions [viz, section 408(d)(3) and section 402(c), the latter of which governs rollovers from employment-based tax-deferred plans, *see* I.R.C. § 401, to any of a number of tax-deferred plans, including IRAs] were enacted as part of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, sec. 2002(b), (g)(5), 88 Stat. 829, 959–964, 968–969. The purpose of allowing a tax-free rollover from a retirement plan to an IRA was to facilitate portability of pensions. Conf. Rept. 93-1280 (1974), 1974-3 C.B. 415, 502; H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 236, 265. The purpose of the IRA-to-IRA transfers was to permit flexibility with respect to the investment of an IRA. H. Rept. 93-807, *supra*, 1974-3 C.B. (Supp.) at 374; S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 214. With respect to rollovers, the legislative history repeatedly speaks in terms of "this same money or property" and "the same amount of money (or the same property)", both for distributions from an IRA and from a qualified plan. H. Rept. 93-807, *supra*, 1974-3 C.B. (Supp.) at 374–375; Conf. Rept. 93-1280, *supra*, 1974-3 C.B. at 502. [Treasury Regulation § 1.408-4(b)], describing rollovers from IRA to IRA, uses the language "if the entire amount received (including the same amount of money and any other property) is paid into an" IRA.

Based on the language of the statutory provisions and the legislative history of those provisions, we hold that petitioner's use of the [cash] distributions from his Keogh and IRA's [sic] to purchase stock which he then contributed to the Smith Barney IRA does not constitute a tax-free rollover contribution under section 402(c) or 408(d)(3), respectively.

*Lemishow*, 110 T.C. at 113 (footnotes omitted).

Section 402, however, is distinct from section 408 in that Congress enacted a limited exception to the "same property" rule in the Revenue Act of 1978, Pub. L. No. 95-600, § 157(f)(1), 92 Stat. 2763, 2806–07. Thus, section 402(c)(6) allows for property to be sold and the

---

from IRAs are governed by section 408. The fact that the taxpayer requested distributions from two different retirement vehicles meant that we had to interpret the rollover provisions of both section 402 and section 408.

proceeds to be contributed to an IRA in a tax-free rollover, whereas there is no similar exception for IRAs governed by section 408. Congress enacted section 402(c)(6) as a means to address a perceived hardship for those taxpayers attempting to roll over investments from section 401 qualified plans but having difficulty finding a trustee willing to accept property in kind. *See* Staff of J. Comm. on Tax'n, 95th Cong., General Explanation of the Revenue Act of 1978, JCS-7-79, at 110 (J. Comm. Print 1979). However, Congress did not enact an analogous provision for IRAs. We are unsure why Congress sought to alleviate this hardship for section 401 qualified plans without making a parallel fix for IRAs. However, our job is to apply the terms of statutes, not revise or update them. *United Therapeutics Corp. v. Commissioner*, No. 10210-21, 160 T.C., slip op. at 26 (May 17, 2023) (citing *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018)). And when Congress includes certain language in one provision but omits it in another, we presume that the inclusion and exclusion are intentional. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("We have often noted that when 'Congress includes particular language in one section of a statute but omits it in another'—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))); *see also Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85–86 (2017) (same).

The text of section 408(d)(3)(A)(i), the legislative history behind section 408(d)(3), our caselaw, and the regulations all make clear that Mr. Caan was required to contribute the P&A Interest, not cash, to the Merrill Lynch IRA in order to preserve its tax-deferred status. Because he did not do so, we hold that the cash proceeds from the liquidation of the P&A Interest were not contributed in a manner that would qualify as a nontaxable rollover contribution under section 408(d)(3)(A)(i).

C. *What Is the 2014 Yearend Fair Market Value of the P&A Interest?*

On the Form 1099–R that reported to the IRS the distribution of the P&A Interest, UBS claimed that the value of the P&A Interest was $1,910,903, which was the 2013 yearend fair market value. The Estate generally argues that that Form 1099–R is incorrect because UBS never distributed the P&A Interest and the value it reported was erroneous. The Commissioner agrees with the Estate that the P&A Interest was misvalued. He urges us to adopt a value of $1,548,010, which was the ending capital account balance reported by the P&A Fund on Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., for tax year

2015. He believes that the 2015 ending capital account balance serves as the best approximation of the P&A Interest's value at the time of the distribution because the distribution occurred on November 25, 2015, and the ending capital account balance was Mr. Caan's capital account balance as of December 31, 2015.

In its briefs, the Estate does not argue against the Commissioner's proposal, focusing instead on arguing that the Form 1099–R is "a useless, inaccurate, [and] unreliable document." Since the value the Commissioner proposes closely matches the aggregate 2017 liquidation amount of $1,532,605.46, and since the Estate does not propose a different value, we hold that the value of the P&A Interest at the time of the distribution was $1,548,010.

D. *Did the IRS Err in Not Granting a Waiver of the 60-Day Rollover Period Under Section 408(d)(3)(I)?*

Three days before filing the Petition, Mr. Caan sent a private letter ruling request to the IRS, asking it to waive the 60-day rollover period. *See* I.R.C. § 408(d)(3)(A)(i), (I); Rev. Proc. 2003-16, 2003-1 C.B. 359 (prescribing the procedures by which taxpayers may request a waiver under section 408(d)(3)(I)). After considering the request, the IRS declined to issue a private letter ruling on the grounds that waiving the 60-day rollover period would be inconsequential, in light of the same property requirement. Mr. Margiotta (acting on Mr. Caan's behalf) liquidated the P&A Interest and contributed the cash proceeds to the Merrill Lynch IRA. In so doing, Mr. Caan ran afoul of the same property requirement. *See supra* pp. 21–24. Thus, the IRS reasoned that even if it were to grant a waiver of the 60-day rollover period, the cash contribution to the Merrill Lynch IRA could not be respected as a rollover contribution, since the IRS cannot waive the same property requirement. The Estate disagrees with the IRS's reasoning, contending that a waiver under section 408(d)(3)(I) should have been granted given the facts and circumstances of this case.

Section 408(d)(3)(I) provides that the IRS "may waive the 60-day requirement . . . where the failure to waive such requirement would be against equity or good conscience, including casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement." The parties' disagreement over whether the IRS appropriately declined to issue a waiver under section 408(d)(3)(I) presents two antecedent questions: (1) Does our Court have jurisdiction to review such a denial, and (2) if we do have jurisdiction, what is our

standard of review? These are both questions of first impression for our Court.

1. *Jurisdiction to Review Denials of Waivers Under Section 408(d)(3)(I) and Standard of Review*

In *Trimmer v. Commissioner*, 148 T.C. 334, 345–49 (2017), we considered similar questions in a case similar to this one. *Trimmer* concerned section 402, which governs distributions from a qualified plan known as an employees' trust.[13] A short background on section 402 is helpful in understanding what transpired in *Trimmer*. Section 402(a) provides that a distribution from an employees' trust is "taxable to the distributee, in the taxable year of the distributee in which distributed." Section 402(c) allows for rollover contributions similar to how section 408(d)(3) allows for rollover contributions for IRAs. Section 402(c)(1) excludes from gross income distributions from an employees' trust that are thereafter contributed "to an eligible retirement plan." Section 402(c)(3)(A) provides that such a contribution must be made no later than 60 days "following the day on which the distributee received the property distributed." Section 402(c)(3)(B) allows the IRS to "waive the 60-day requirement . . . where the failure to waive such requirement would be against equity or good conscience, including casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement."

One of the taxpayers in *Trimmer* held retirement accounts in two employees' trusts. *Trimmer*, 148 T.C. at 336. This taxpayer received a distribution from each of his two retirement accounts. *Id.* He then deposited the two distribution checks into a joint bank account he held with his wife. *Id.* Over 10 months later, on the advice of his tax return preparer, he opened an IRA and rolled over the two distributions into his new IRA. *Id.* at 336–37. On his joint income tax return, he reported the two distributions but claimed that they were nontaxable. *Id.* at 337. The IRS sent him a letter proposing, among other things, to include the two distributions in income. *Id.* In his response to the IRS's letter, the taxpayer explained his circumstances, which included a mental health issue, and asked for a waiver of the 60-day rollover period. *Id.* at 338.

---

[13] An employees' trust is a "trust created or organized in the United States" that is "part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries." I.R.C. § 401(a).

The IRS summarily denied the request in a boilerplate response. *See id.* at 338–39.

In deciding that we had jurisdiction to review the IRS's denial of a hardship waiver under section 402(c)(3)(B), we stated:

> Nothing in section 402(c)(3) expressly precludes judicial review, nor does the legislative history reveal any such congressional intent. To the contrary, because the denial of a hardship waiver can affect directly the existence and amount of any asserted deficiency—as it does in this case—the procedures Congress has established for judicial review of the Commissioner's deficiency determinations logically contemplate review of such a denial as one element of the deficiency determination.

*Trimmer*, 148 T.C. at 346–47 (footnote omitted) (citing *Estate of Gardner v. Commissioner*, 82 T.C. 989, 996 (1984)). We therefore concluded that our jurisdiction to redetermine deficiencies under section 6213(a) includes jurisdiction to review any discretionary agency actions that would affect the deficiency amount. *Trimmer*, 148 T.C. at 348; *Estate of Gardner*, 82 T.C. at 999. We also concluded, on the basis of our prior caselaw, that the appropriate standard of review is abuse of discretion. *Trimmer*, 148 T.C. at 348.

Our reasoning in *Trimmer* applies here as well. Sections 402(c)(3)(B) and 408(d)(3)(I) are worded identically. Neither the text of section 408(d)(3) nor its legislative history precludes judicial review; and whether the Commissioner grants a waiver under section 408(d)(3)(I) is a discretionary determination that would affect a taxpayer's deficiency. We therefore extend our holding in *Trimmer*, 148 T.C. at 345–49, to denials of waivers under section 408(d)(3)(I). In other words, we hold that we do have jurisdiction to review the Commissioner's denial of a waiver under section 408(d)(3)(I) and that we review such a denial for abuse of discretion. *See Trimmer*, 148 T.C. at 348; *Mailman v. Commissioner*, 91 T.C. 1079, 1084 (1988) ("The standard of review most appropriate in the case of a failure to grant a waiver is . . . whether [the Commissioner] abused his discretion."); *Estate of Gardner*, 82 T.C. at 1000; *see also* 5 U.S.C. § 706(2)(A) (providing that generally a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

2. *Did the Commissioner Abuse His Discretion in Declining to Waive the 60-Day Rollover Period Under Section 408(d)(3)(I)?*

As we explained above, the IRS declined to issue a waiver under section 408(d)(3)(I) because Mr. Caan liquidated the P&A Interest after the distribution from UBS and, in so doing, ran afoul of the same property requirement, *see* I.R.C. § 408(d)(3)(A)(i); *Lemishow*, 110 T.C. at 113, which the IRS cannot waive. We hold that denying a waiver on that basis is not an abuse of discretion. It cannot be an abuse of discretion for the IRS to deny a waiver where granting the waiver would not have helped the taxpayer in any way.

The Estate urges us to adopt an equitable resolution to this case. Although we are sympathetic to the Estate's situation, we are not a court of equity, and we cannot ignore the statutory law to achieve an equitable end. *See Commissioner v. McCoy*, 484 U.S. 3, 7 (1987); *Stovall v. Commissioner*, 101 T.C. 140, 149–50 (1993). This case is a quintessential example of the pitfalls of holding nontraditional, non-publicly traded assets in an IRA. Failure to follow the labyrinth of rules surrounding these assets can mean forfeiting their tax-advantaged status.

IV. *Conclusion*

We hold that the P&A Interest was distributed in tax year 2015 within the meaning of section 408(d)(1). We further hold that Mr. Caan did not thereafter contribute the P&A Interest in a manner that would qualify as a nontaxable rollover contribution under section 408(d)(3), because he changed the character of the property when he liquidated the P&A Interest. We agree with the Estate that UBS misvalued the P&A Interest, and we hold that its value was $1,548,010 at the time of the distribution. But we disagree with the Estate that the Commissioner abused his discretion in declining to issue a waiver of the 60-day rollover period, as such a waiver would not have helped Mr. Caan in this case.

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we consider them moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*